### THE NORTHMAN.

### TEXAS CO. v. J. M. GUFFEY PETROLEUM CO.

(Circuit Court of Appeals, Second Circuit. May 8, 1911.)

Nos. 224, 225.

SHIPPING (§ 54*)—STEAMSHIP BREAKING FROM WHARF—NEGLIGENCE OF CHARTERER.

Libelant was owner of the tank steamer Winifred, 300 feet long, and charterer of the Northman, 250 feet long, owned by respondent and cross-libelant. Her charter required the Northman to dock wherever

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

directed by libelant, and, arriving at Philadelphia loaded, she was directed to tie up outside of the Winifred, lying in the Schuylkill river, which she did, making fast to the Winifred and running one line from her stern to the wharf, which was all she could do, owing to the greater length of the Winifred. There was a freshet in the river at the time, but nothing unusual at the season, and the Winifred's lines gave way, allowing both vessels to drift down stream, where they grounded, remaining fastened together. *Hold*, that the fault was solely that of libelant, which was also lessee of the dock, for not making the Winifred secure, as might readily have been done, and that it was liable for the damage to the Northman.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219-221; Dec. Dig. § 54.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the J. M. Guffey Petroleum Company against the steamship Northman; The Texas Company, claimant, and cross-suit by the Texas Company against the Petroleum Company. Decree for respondent, dismissing libel, in the first suit, and for libelant in the sum of $7,964.40 in the second, and the J. M. Guffey Petroleum Company appeals. Affirmed.

Burlingham, Montgomery & Beecher (Charles C. Burlingham and Chauncey I. Clark, of counsel), for appellant.

Wallace, Butler & Brown (James K. Symmers, of counsel), for respondent.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The Guffey Petroleum Company at the time in controversy was the owner of the steamship Winifred and the charterer of the steamship Northman. The former was 300 and the latter 250 feet long. Both were tank steamers. The charter party provided that the Northman should load and discharge at a place, at a dock or alongside lighters, reachable on her arrival, to be indicated by the Guffey Company, where she could always lie safely afloat.

On March 14, 1907, the Northman arrived at Philadelphia from Port Arthur, Tex., with a cargo of oil, and was directed by the Guffey Company to proceed to Gibson's Point wharf on the Schuylkill river and make fast outside of the Winifred, which was lying moored at that point. The Winifred had discharged her cargo and was to pass out on the following morning. As the Northman was loaded and the Winifred was light, the latter was much higher in the water than the former, making it practically impossible to pass a line to the bulkhead except at the stern, which was substantially parallel with the stern of the Winifred. The Northman had out a stern line to the shore, but no bow line. Both vessels were headed up-stream. A freshet was prevailing at the time and between nine and ten o'clock the Winifred's lines gave way and both drifted down stream and grounded half a mile below, causing the damage complained of. That the Northman was securely fastened to the Winifred is demonstrated

by the fact that the two vessels remained together even after they grounded.

The District Judge found that the Guffey Company, as owner of the Winifred and lessee of the wharf, was liable, either as wharfinger or vessel owner, for not providing suitable mooring posts or for failing to put out sufficient lines from the Winifred to the wharf.

There was, as stated, a freshet prevailing at the time, but there was nothing abnormal about this condition, which was of yearly occurrence and was to be expected during the month of March. There was no vis major, no unusual and unexpected disturbance of the elements; nothing, in fact, that could not have been guarded against by human skill and caution. As the breaking away was not the result of inevitable accident, it must be attributed to the fault either of the Northman, the Winifred or the wharfinger. The principal charge against the Northman is that she had not sufficient lines to the wharf. As before stated, it was impossible to use any lines other than from the bow and stern, and as she had out a stern line, it is only necessary to inquire whether she could have put out a bow line. Post No. 1 was the only one to which a bow line could have been fastened. The District Judge finds:

"That the stem of the Northman was so far behind the stem of the Winifred that a line could not be passed from the Northman forward to any of the posts on the dock."

We think this conclusion is amply justified by the testimony. It is said that the Northman might have run bow lines to trees in a neighboring park, but the suggestion is highly chimerical, and the precaution one which the Northman was under no obligation to take, especially as the Guffey Company, with full knowledge of the situation, did not suggest taking any extraordinary precautions.

Again, it is argued that the Northman should have dropped her anchor straight down from her bow into the river. How such a maneuver could have prevented the vessels from breaking away from the dock it is difficult to perceive; especially so in view of the fact that when they broke away each dropped her anchor and neither held in the soft mud at the bottom of the river. The District Judge says of these contentions, "they seem to me entirely untenable and mere after-thoughts." We are unable to find negligence on the part of the Northman; she was under the control of the Guffey Company and was in duty bound to go to the dock designated by that company. She could not have refused to go to the Gibson Point wharf because the Winifred was lying there for the reason that it was at the express request of her owners that she should be "breasted out" from the dock. A refusal to go there would have been wholly unjustifiable and in direct conflict with the terms of the charter-party. If there were any hidden defects or abnormal dangers to be guarded against, it was the duty of the charterer's agents in charge of the dock so to inform the Northman. Having moored to the Winifred in the usual way and, apparently, in the only practicable way, and receiving no protest and no suggestion that any additional precaution should be taken, we think the Northman was justified in assuming that the Winifred was satisfied

with the situation and that she was moored sufficiently fast to hold both vessels. By a process of exclusion we have thus reached the point where the accident cannot be said to be inevitable or due to the negligence of the Northman. The only alternative is that it was due to fault of the Winifred in being insufficiently moored to the dock or to the fault of the Guffey Company in providing insufficient posts. That one of these posts was pulled over by the strain, permitting the line to slip off, is not disputed. There is a conflict in the testimony as to where this post was located. No. 1 at the upper corner of the wharf was the one on which the greatest strain was placed and there is testimony that this post was made of wood and gave way, permitting the lines to slip over the top. There is also testimony that No. 6 was the only post bent over by the strain, but the direct testimony that it was No. 1 is strengthened by the presumption that this post, which held the bow lines sustained the great weight of the strain and would naturally be the first to be bent over. A finding that it was post No. 1 cannot be set aside as against the weight of evidence. It is not important to determine whether it was made of iron or wood, as in either case, if the post gave way, it was incapable of sustaining the weight liable to be placed thereon. It may here be noted also that the same result would have followed if the Northman had had a bow line out to this post.

To recapitulate: The Northman was under the control of the Guffey Company. It was her duty to go to the dock at Gibson's Point and tie up outside the Winifred, the charter required it and she had no legal excuse for disregarding the direction. The Guffey Company was in full control of this dock and knew, or should have known, whether its lines and posts were sufficient to stand the strain under the conditions then existing in the river. The agents of the Guffey Company saw the Northman arrive and the manner in which she made fast. They knew that she had no line to the shore except at the stern. They knew that she had no bow line out and that the Winifred's bow extended so far beyond the Northman that it was doubtful if a line could be placed on post No. 1. All this was known and yet there was not a word of complaint or warning from the vessel or the dock that the Northman's methods were improper. No doubt was expressed as to the Winifred's lines being sufficient to carry the added strain of the Northman.

In such circumstances, no blame can be attributed to the Northman and it must be found that the Guffey Company was at fault for improperly mooring the Winifred, or for failing to provide mooring posts sufficient to withstand the strain made necessary by the direction to the Northman to tie up outside the Winifred.

The decrees are affirmed with interest and costs.