**AMERICAN PRESIDENT LINES, LTD., a corporation, Libelant,**

v.

**UNITED STATES of America, Respondent.**

No. 27980.

United States District Court
N. D. California, S. D.
March 30, 1961.

574

Peter N. Teige, George D. Wick, San Francisco, Cal., for libelant.

Cecil F. Poole, U. S. Atty., San Francisco, Cal., for respondent.

GOODMAN, District Judge.

Libelant, the owner of the vessel SS PRESIDENT ARTHUR seeks to recover $27,742.33 from the United States for the loss of her anchor and the loss of and damage to portions of her anchor chains while she was operating under time charter to the Military Sea Transportation Service of the Department of the Navy. Libelant claims that the United States is liable because the loss and damage was the natural and foreseeable result of a breach by the Government of Article 8 (a) of the time charter agreement in ordering the PRESIDENT ARTHUR to load at an unsafe port.

Libelant's claim for damage to the PRESIDENT ARTHUR was initially submitted for administrative determination as required by Article 30 of the time charter agreement. In the administrative proceedings, libelant was awarded damages found to have been caused by the Government, because, in violation of the charter, it ordered the PRESIDENT ARTHUR to load at an unsafe port.

However, the damages sought in this libel were disallowed. The administrative determinations are set forth in decisions of the Armed Services Board of Contract Appeals, dated February 25, 1960 and September 2, 1960. As provided in Article 30 of the time charter agreement, this Court is bound by the facts found by the Board of Contract Appeals. But, it has the power to review any questions of law. 68 Stat. 81; 41 U.S.C.A. § 322.

The Board of Contract Appeals found that during operation under the time charter, the Military Sea Transportation Service (MSTS) diverted the PRESIDENT ARTHUR, then empty, to Villa do Porto in the Azores to load cargo at anchorage there. On her arrival there on November 30, 1957, there was a heavy swell created by strong winds common there in winter. The Port Captain by radio refused to permit her to enter the port and suggested that she anchor at Sao Lourenco Bay, some 13 miles to the northeast, until weather conditions sufficiently improved to permit loading operations at Villa do Porto.

The PRESIDENT ARTHUR then proceeded to Sao Lourenco Bay and dropped starboard anchor in the properly designated area there later in the day on November 30. By the following morning of December 1, the starboard anchor chain had crept out to its full length of 10 shots or 6 shots more than originally let out. This was due to the fact that the winch brake, which should have held the chain from creeping, failed to do so due to the effect of a strong southwesterly offshore wind. At this point, the port anchor was dropped to help steady the vessel from rolling and pitching and the additional 6 shots of starboard anchor chain were hauled back into the vessel. The position of the vessel was now some 250 yards to the west of its original anchorage but still within the general anchorage area. During the ensuing hours the wind increased and, by midnight, had become extremely gusty, shifting to the northwest. Since the vessel no longer had shelter from the island, early on December 2, the captain ordered both anchors weighed in order to ride out the wind in the open sea. The port anchor was safely brought aboard but the starboard anchor chain parted with the loss of the anchor and some 3½ shots of chain.

By the morning of December 4 the wind had subsided sufficiently to enable the PRESIDENT ARTHUR to obtain clearance to enter the anchorage area at Villa do Porto. During the next few days, the PRESIDENT ARTHUR engaged in loading operations at Villa do Porto and sustained additional damage due to the fact that she was rolling and pitching in a heavy sea and swell and was exposed to gusty winds.

The Board of Contract Appeals found that the Government's insistence on cargo operations at Villa do Porto under the prevailing weather conditions constituted a breach of the safe berth warranty in Article 8 of the charter party agreement. It held the Government liable for the damages sustained by the PRESIDENT ARTHUR while loading at Villa do Porto. But, it concluded that the Government was not liable for the damage sustained by the PRESIDENT ARTHUR while she lay in Sao Lourenco Bay waiting for the weather to improve sufficiently to permit her to load at Villa do Porto. The basis for this conclusion was that the damage sustained in Sao Lourenco Bay was not proximately caused by the Government's directive that the PRESIDENT ARTHUR load at the unsafe port of Villa do Porto. The reason given for this conclusion was that the danger to the vessel in anchoring in Sao Lorenco Bay was foreseeable to her master as well as to the Government, and her master had an available alternative in that he could have skirted the island until the bad weather abated.

In concluding that the damage suffered by the PRESIDENT ARTHUR at Sao Lourenco Bay was not the proximate result of the Government's breach of contract, the Board of Contract Appeals misinterpreted the applicable law.

The decisions involving the so-called "safe-port" and "safe-berth" provisions in charter party agreements make it very clear that a charterer cannot escape liability for damage ultimately resulting from a directive that the chartered vessel go to an unsafe port or berth merely because the captain in attempting to comply, follows an obviously risky course of action in preference to an available alternative which might have avoided the damage. In most of the decisions finding liability on the part of the charterer there was a danger foreseeable to the captain and an available alternative.[1]

The decisions recognize that when a charterer directs a vessel to a port the captain believes to be unsafe, he is confronted with a difficult dilemma. He may refuse to comply, thus thwarting the desires of the charterer and assuming the risk of an ultimate determination that the port was not in fact unsafe. Or, he may attempt to comply, and run the risk of making a miscalculation in seeking to avoid the danger to which the charterer's directive has subjected the vessel. When a captain has been placed in such a dilemma by a charterer's breach of contract in directing the vessel to an unsafe port, the entire burden of responsibility for the safety of the ship cannot legally be shifted to the captain. If the captain elects to attempt to comply with the charterer's directive, it would be inequitable to relieve the charterer of liability for harm caused by the peril which his wrongful demand created merely because the captain's choice of alternative courses, which give promise of avoiding such peril, proves to be incorrect. Thus, the applicable decisions have established the principle that the charterer is not relieved of legal responsibility for the consequences of his breach of contract unless the course followed by the captain is so imprudent that it can fairly be said to be an intervening act of negligence.[2] It is not enough that the course followed by the captain entails some foreseeable risk of harm. For, some risk is inherent in any attempt to proceed to an unsafe port. To constitute an intervening act of negligence, the course followed by the captain must entail an unreasonable risk.[3]

In the present case the Board of Contract Appeals found that the Government breached the charter party agreement by directing the PRESIDENT ARTHUR to load at the unsafe port of Villa do Porto. The master of the PRESIDENT ARTHUR was initially unable to enter Villa do Porto because of the hazardous weather conditions. But, in an effort to comply with the Government's demand that cargo be loaded there, he followed the Port Captain's suggestion that he anchor in Sao Lourenco Bay to await an improvement in the weather. The Board of Contract Appeals found that this course entailed a foreseeable risk of harm because of the very weather conditions which made Villa do Porto an unsafe port. It also found that the master had an available alternative in that he might have skirted the island until the weather improved. It concluded that it necessarily followed that the damage suffered by the PRESIDENT ARTHUR at Sao Lourenco Bay was not the proximate result of the Government's demand that she load cargo at Villa do Porto. In so concluding, the Board committed an error of law. For the law, as established by the cited decisions, is that action taken by a master in an effort to comply with the demand of a charterer that he proceed to an unsafe port does not constitute an intervening act of negligence

---

1. See e. g., Reardon Smith Line Ltd. v. Australian Wheat Board, 1956 Appeal Cases 266; Compania Naviera Maropan v. Bowaters, 2 Q.B. 68 (1955); G. W. Grace & Co., Ltd. v. General Steam Navigation Co., Ltd., 2 K.B. 383 (1950); P. Dougherty Co. v. Bader Coal Co., 244 F. 267 (D.C.Mass.1917); The Northman, 189 F. 33 (2 Cir. 1911).

2. Reardon Smith Line Ltd. v. Australian Wheat Board, 1956 Appeal Cases 266; Compania Naviera Maropan v. Bowaters, 2 Q.B. 68 (1955); G. W. Grace & Co., Ltd. v. General Steam Navigation Co., Ltd., 2 K.B. 383 (1950).

3. Cases cited in note 2, supra.

merely because the action taken entails some foreseeable risk. To break the chain of causation, the master's action must entail a risk that is unreasonable under all the circumstances. Upon the facts found by the Board in respect to the nature of the risk in anchoring in Sao Lourenco Bay and the available alternative, it must be concluded as a matter of law that the risk was not an unreasonable one for the master to take. There was thus no act of the master sufficient in law to break the chain of causation linking the Government's breach of contract with the damage sustained by the PRESIDENT ARTHUR at Sao Lourenco Bay. It follows that the Government is liable for such damage.

Present judgment accordingly.