**In re Grand Jury Subpoena Duces Tecum Served upon RABBINICAL SEMINARY NETZACH ISRAEL RAMAILIS dated April 11, 1978.**

No. 78 C 773.

United States District Court,
E. D. New York.

May 10, 1978.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Carol B. Amon, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for the grand jury.

Thal & Youtt, New York City (Steven H. Thal, Michel L. Stone, and Harry E. Youtt, New York City, of counsel), for respondent.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

A grand jury sitting in this district served a subpoena on April 11, 1978 upon a representative of the Rabbinical Seminary Netzach Israel Ramailis ("the Seminary"). The subpoena demanded the production of a variety of documents and financial records. An "Advice of Rights" form annexed to the subpoena informed the Seminary that the grand jury is investigating possible violations of 18 U.S.C. § 1001, which makes it a crime to make false statements or to use any false documents in any matter within the jurisdiction of a United States department or agency. The Seminary commenced this proceeding in the form of a motion to quash the subpoena.

The Seminary is a rabbinical teaching institution with historical roots in Vilna, Lithuania. Now located in Brooklyn, New York, the Seminary began in July 1969 to participate in a variety of aid to education programs sponsored by the United States government. In March 1976, the Office of Education of the Department of Health, Education and Welfare (the "Office of Education") began a "program review" of the Seminary's participation in the aid programs. At that time, the Seminary and the Office of Education agreed that the Seminary would suspend participation in the programs and submit records requested by the Office of Education.

During the next two years, the Seminary produced various records, the Office of Education required the Seminary to improve its record-keeping, and further records were submitted. The "program review" escalat-

ed into a full-scale audit by the Audit Agency of the Department of Health, Education and Welfare. The Audit Agency submitted a draft audit to the Seminary in February 1978 for comments. According to the Assistant United States Attorney representing the grand jury in this proceeding, the Office of the Inspector General suspended further administrative proceeding and referred "the matter" to the United States Attorney for criminal investigation in March 1978.

The grand jury has served two subpoenas upon representatives of the Seminary. The Seminary complied with the first one, served on March 14, 1978. This proceeding challenges only the April 11, 1978 subpoena. Counsel for the Seminary asserts that this subpoena violates the Seminary's rights under the First and Fourth Amendments to the Constitution, and alleges that the grand jury investigation

> "is being used solely as a vehicle by the Office of Education to continue harassing [the Seminary] . . . in order to keep the [Seminary] from being reinstated [as a participant in federal aid-to-education programs] . . . and to punish [the Seminary] for having exercised its right to petition government officials to seek to speed up the [administrative] review process."

### I

The Seminary claims two distinct First Amendment protections in support of its challenge to the subpoena. First it claims that the demand for records creates a "chilling effect" on the free exercise of religion.

■ The Free Exercise Clause provides two forms of protection of religious freedom. First, government is absolutely prohibited from regulation, discrimination or penalization of religious beliefs as such. Second, regulation of acts predicated on religious beliefs meets constitutional stan-

dards only if some compelling governmental interest is served by that regulation. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Murdock v. Com. of Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1940); *Stevens v. Berger,* 428 F.Supp. 896 (E.D.N.Y.1977). The Free Exercise Clause is no talisman, however, which automatically protects religious organizations from any governmental regulation. The religious character of an organization does not provide a shield from regulation which in no way affects either religious beliefs or acts. *Securities and Exchange Commission v. World Radio Mission, Inc.,* 544 F.2d 535 (1 Cir. 1976); *United States v. Top Sky,* 547 F.2d 486 (9 Cir. 1976); *Hearde v. Commissioner of Internal Revenue,* 421 F.2d 846 (9 Cir. 1970); *Muhammad Temple of Islam-Shreveport v. City of Shreveport,* 387 F.Supp. 1129 (W.D.La.1974), aff'd 517 F.2d 922 (5 Cir. 1975).

The Seminary makes no claim that the subpoena was issued as part of an attack on its students', faculty members', or administrators' Jewish beliefs. Nor does it appear that production of the demanded records would violate any tenet of Judaism. The grand jury has not required compliance with the subpoena in a manner at odds with Jewish law or belief by, for instance, requiring Seminary officials to appear on a holiday. See *Smilow v. United States,* 465 F.2d 802 (2 Cir. 1972), *vac. on other grs.,* 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972). In none of these particulars does the challenged subpoena restrain the free exercise of religion.

■ Accepting the fact that the Talmudic and Biblical studies conducted at the Seminary are as integrally related to Judaism as the door-to-door proselytizing was to the faith of the Jehovah's Witnesses in *Murdock v. Commonwealth of Pennsylvania, supra,* production of the documents listed in the challenged subpoena would not directly interfere with those studies.[1] To

---

1. The Seminary argues that its continued suspension from Office of Education programs has inhibited its ability to attract students. Assuming that such inhibition impinges on rights protected by the Free Exercise Clause, this pro-

ceeding is limited to an attack upon a grand jury subpoena. The propriety of the determinations concerning the Seminary by the Office of Education is not at issue.

the extent that compliance with the subpoena might indirectly interfere with students' or potential students' willingness to study at the Seminary,[2] such a claim is best understood as arising under the right of freedom of association guaranteed by the First Amendment. See *Matter of Wood,* 430 F.Supp. 41, 46 (S.D.N.Y.1977).

## II

There can be no doubt that compelled disclosure of financial transactions and records "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). The Seminary claims that compliance with the challenged subpoena will have an inhibiting effect on its students' and faculty members' constitutionally protected right to participate in the Seminary's program of studies. To evaluate this claim, it is first necessary to determine whether the freedom of association is affected at all by the grand jury's demand. If so, the next step is to evaluate the grand jury's claim that its subpoena meets the strict standard applicable to governmental demands for information which inhibit the enjoyment of that freedom.

The challenged subpoena requires the Seminary to produce a variety of accounting and financial ledgers, worksheets, journals and documents. The list of eighteen items is set forth as an Appendix to this opinion. The requested documentation will reveal to the grand jury the identity and financial status of many Seminary students; the identity, salary, and, perhaps, academic discipline of Seminary faculty members; the identity of the Seminary's vendors, including book suppliers, and, perhaps, the titles of volumes used by the Seminary.

In recognizing the constitutional implications of compulsory disclosure of financial

records in *Buckley v. Valeo, supra,* at 66, 96 S.Ct. 612, the Court explicitly adopted Justice Powell's comment, concurring in the judgment in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 1526, 39 L.Ed.2d 812 (1974):

"Financial transactions can reveal much about a person's activities, associations, and beliefs."

Privacy of belief is particularly important to schools and educators, since threats to that privacy simultaneously threaten academic freedom in that contest. See, e. g., *Sweezy v. State of New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

■ Compliance with the challenged subpoena would, therefore, burden the right of privacy of association and belief asserted by the Seminary. On this record, however, it is difficult to state precisely the extent of that burden. In *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1957), the civil rights organization appealed from a judgment holding it in contempt for refusing to comply with a court order requiring production of its Alabama membership lists. In Mr. Justice Harlan's seminal opinion reversing the contempt judgment, the Court indicated the palpable nature of the threat to First Amendment rights in the circumstances of that case:

"[The N.A.A.C.P.] has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of [the N.A.A.C.P.] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from

2. Any immunization of religious schools from the record-keeping requirements of the federal aid-to-education programs or from criminal liability for malfeasance in participation in those programs would pose serious questions under the Establishment Clause.

the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the *consequences of this exposure."* 357 U.S. at 462–63, 78 S.Ct. at 1172 (emphasis supplied).

Eighteen years later, in *Buckley v. Valeo, supra,* the Court held that proof of adverse consequences was crucial to determining the nature of the burden on minor political parties of compliance with the reporting and disclosure requirements of the Federal Election Campaign Act. 424 U.S. at 69–72, 96 S.Ct. 612. Here, as in the *Buckley* case, the factual showing falls far short of the *N.A.A.C.P. v. Alabama* standard.

■ At oral argument, counsel for the Seminary offered to present evidence at a hearing to establish that dire consequences to the Seminary and its followers would result from disclosure. Assuming that such a showing might be made, it would not, as indicated earlier, end this court's inquiry. Government may compel even those disclosures which directly burden the rights asserted by the Seminary in service of "an interest in obtaining the disclosures . . which is sufficient to justify the deterrent effect" on those rights. *N.A.A.C.P. v. Alabama, supra,* 357 U.S. at 463, 78 S.Ct. at 1172. The governmental interest must be compelling, and there must be some substantial relation between that interest and the information sought. *Ibid.* See also *Buckley v. Valeo, supra,* at 64–66, 96 S.Ct. 612.

The challenged subpoena satisfies these requirements. While "the first amendment rights of free association and freedom of religion reach within the closed doors of the grand jury chamber" (*Matter of Wood, supra,* at 45), "the investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen." *Branzburg v. Hayes,* 408 U.S. 665, 700, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972). Here, the grand jury is investigating possible violations of 18 U.S.C. § 1001, obviously in response to the civil investigation of the Seminary's participation in the aid-to-edu-

cation programs. While violations of § 1001 are perhaps not so dramatic as the drug, civil disorder, or assassination plot investigations involved in the *Branzburg* case or *Bursey v. United States,* 466 F.2d 1059, *reh. denied* 466 F.2d 1090 (9 Cir. 1972), it cannot be said, nor does the Seminary suggest, that the government's interest in investigating violations of § 1001 is not so compelling as the interests in the *Branzburg* or *Bursey* cases.

It also appears that the documentation demanded in the challenged subpoena bears a substantial relation to the subject matter of the investigation. The grand jury has not required a complete roster of all the Seminary's students, their academic work, or their professors' credentials. The subpoenaed material all relates to the financial operations of the Seminary and of its students' loan transactions. There is no showing that the grand jury investigation is other than an inquiry into the possibility that the Seminary obtained funds by making false claims and subsequently misused those funds. In *Bursey v. United States, supra,* the Court held improper certain questions asked of members of the staff of the Black Panther Party newspaper only because no lawful prosecution based on the information sought was possible (466 F.2d at 1087–88) or the circumstances being inquired into were not "sufficiently suspicious" when balanced against the First Amendment rights involved (*Id.* at 1088). Such is not the case here. The investigation and possible prosecution to which the subpoenaed material relates are not unlawful. Nor can it be said, in light of the audit report, that the Seminary's financial history is insufficiently "suspicious" to support the grand jury's inquiry into its financial records.

In sum, the grand jury is not seeking "to expose for the sake of exposure." *Watkins v. United States,* 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957). It is investigating crime, and "the longstanding principle that 'the public . . . has the right to every man's evidence,' except for those protected by a constitutional, com-

mon-law, or statutory privilege . . . is particularly applicable to grand jury proceedings." *Branzburg v. Hayes, supra,* 408 U.S. at 688, 92 S.Ct. at 2660 (citations omitted). The materials requested by the grand jury are not so privileged.

### III

■ The Seminary also challenges the subpoena as unreasonably overbroad. Whether limitations on the scope of the grand jury subpoena power stem from the Fourth Amendment, the Due Process clause of the Fifth Amendment, or Rule 17 of the Federal Rules of Criminal Procedure presents an interesting question [3] which the court need not decide. Whatever the source of those limitations, their parameters are clear. The parties agree that grand jury subpoenas must satisfy a three-part test when their reasonableness is challenged:

1) The documents requested must be shown to have some general relevance to the subject matter of a legitimate grand jury investigation.

2) The subpoena must describe the materials to be produced with reasonable particularity.

3) The documents may not cover more than a reasonable period of time.

The challenged subpoena meets this test.

■ *Relevance.* Because the secrecy attendant upon grand jury proceedings precludes the target of a subpoena from knowing the status of the investigation of which the subpoena is a part, it is appropriate to require the grand jury to bear the burden of demonstrating the relevance of the demanded material to the investigation. *In re Grand Jury Subpoena Duces Tecum (M. G. Allen & Associates, Inc.),* 391 F.Supp. 991, 995 (D.R.I.1975). Typically, this burden is easily met, upon a mere showing that

the material "may have some possible connection" to the subject matter. *Id.* at 997. As noted above in the discussion of the claimed threat to rights protected by the First Amendment, the requested material meets the more difficult burden of "substantial relation." The documents and financial records demanded by the subpoena clearly have a possible connection to the investigation as described in the affidavit of the Assistant United States Attorney working with the grand jury.[4]

■ *Particularity of description.* A grand jury subpoena must identify the demanded documents sufficiently clearly to permit compliance, and the request may not be so broad as to be oppressive. The subpoena here challenged either names the documents or identifies financial records in clearly comprehensible terms. The request is not so overbroad as to prevent a case of improper oppressiveness. The grand jury's investigation includes an inquiry into alleged misuse of funds received from federal aid-to-education programs. Such inquiry necessarily requires tracing the Seminary's expenditures; in light of the investigative need for these documents, their production is not unduly oppressive.

■ *Reasonable period of time.* The Seminary claims that since it participated in the aid-to-education programs only from July, 1969 to March, 1976, the subpoena, requesting records for the period from January 1, 1969 covers an impermissibly extensive period of time. No magic figure limits the vintage of documents subject to a grand jury subpoena. The law requires only that the time bear some relation to the subject matter of the investigation. *In re Grand Jury Subpoena Duces Tecum (Provision Salesmen and Distributors Union),* 203 F.Supp. 575 (S.D.N.Y.1961). The subpoena demands financial records of the Seminary

---

3. See *In re Horowitz,* 482 F.2d 72 (2d Cir. 1973).

4. It may well be true that, as the Seminary claims, some of the demanded documents will disclose information in no way probative of possible criminal acts. The grand jury is not required, however, to demonstrate the rele-

vance of each particular document. Indeed, a grand jury subpoena need not even identify particular documents. *In re Horowitz, supra.* Relevance may be established with reference to categories of documents. *Id.* at 80; *M. G. Allen & Associates, supra,* 391 F.Supp. at 998.

for the six-month period immediately prior to its participation in the programs and the twenty-one months subsequent thereto. The bona fides of the Seminary's representations in entering the program and its subsequent use of the funds might not be subject to determination solely by inspection of records concerning the period of participation.[5] The records requested will permit the grand jury to examine relevant financial data and do not attempt to review the institution's entire history. Compare *Application of Certain Chinese Family Benevolent and District Associations,* 19 F.R.D. 97 (N.D.Cal.1956).

The challenged subpoena is not unreasonably oppressive.

## IV

■■■ The Seminary makes a final claim that the challenged subpoena represents bad faith harassment by the government, in view of the already extensive document production in connection with the administrative investigations and the Seminary's compliance with the first grand jury subpoena. Prior document production does not, however, render a proper subpoena unreasonable, *Provision Salesmen and Distributors Union, supra,* at 582–83, nor does a prior civil investigation into the same subject matter. *M. G. Allen & Associates, Inc., supra,* at 1002. The grand jury is entitled to fresh evidence and is not bound by the prior civil investigation. There is no proof that the government is improperly using the grand jury's subpoena power to pursue a civil investigation. The Assistant United States Attorney flatly states that the administrative investigations into the Seminary have been suspended, and that she understands her obligation to protect the secrecy of grand jury proceedings. On this record, there is no basis to conclude that misuse of the grand jury either has occurred or is imminent.

5. That some of the requested records are so old as to be beyond the potentially applicable statute of limitations does not render the subpoena

## V

For the foregoing reasons set forth, the Seminary's application for an order quashing the subpoena or, in the alternative, a protective order, is denied. The Seminary is directed to comply forthwith with the subpoena served upon it on April 11, 1978. So ordered.

## APPENDIX

The challenged subpoena requires production of "all books, records, documents, memoranda and writings of any kind pertaining to the financial operation of the [Seminary] for the period January 1, 1969 through December 31, 1977, including but not necessarily limited to the following:

(1) General ledgers;

(2) General journals;

(3) Accounts payable ledgers;

(4) Accounts receivable ledgers;

(5) Cash disbursements journals or other records or workpapers reflecting disbursements;

(6) Cash receipts journals or other workpapers or records reflecting receipts;

(7) Check registers;

(8) Checkbooks, check stubs and cancelled checks;

(9) All bank accounts and bank statements including checking and savings accounts;

(10) All loan applications and loan documents;

(11) All notes payable and/or notes receivable;

(12) All payroll records and employee records including Internal Revenue Service (IRS) Forms 941's—Employee Withholding Statements;

(13) Applications filed with the IRS for tax exempt status;

(14) All copies of Form 990's filed with IRS—Returns of Organizations Exempt from Income Tax;

(15) Identification of safety deposit boxes and contents;

unreasonable. *Provision Salesmen and Distributors Union, supra.*

(16) Accounting workpapers and correspondence with accountants;

(17) Billing records;

(18) Financial statements."