637 F.2d 562
 Pamela VALENTE, Larry Barber, Larry Heft, Kimberly Korman,
and Holy Spirit Association for the Unification of
World Christianity, Appellees/Cross- Appellants,
v.
John R. LARSON, Commissioner of Securities, Minnesota
Department of Commerce; Warren Spannaus, Minnesota
Attorney General; Individually and in
Their Official Capacities,
Appellants/Cross-Appellees.
 Nos. 80-1131, 80-1159.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1980.
Decided Jan. 7, 1981.
 
 Larry Salustro, Sp. Asst. Atty. Gen., Saint Paul, Minn., for appellants/cross-appellees.
 Barry A. Fischer (Robert C. Moest, David Grosz, Larry J. Roberts, on brief), Barry A. Fisher Law Offices, Los Angeles, Cal., for plaintiffs-appellees and cross-appellants.
 Before ROSS, Circuit Judge, GIBSON, Senior Circuit Judge, and SACHS,* District Judge.
 SACHS, District Judge.
 This is an appeal from an order of the district court for the district of Minnesota[1] permanently enjoining the enforcement of the Minnesota Charitable Solicitations Act, Minn.Stat. §§ 309.50-309.61, "as to any and all religious organizations" and also permanently enjoining utilization of certain sections of the Act "against plaintiffs and other persons claiming to be religious organizations or members thereof." In the same order the district court declared the Act to be unconstitutional as applied to religious organizations and members thereof but constitutional as applied to non-religious organizations and members thereof. The court also ruled certain enforcement sections of the Act unconstitutional as applied to persons "claiming" to be religious organizations or members thereof.
 Plaintiffs are the Holy Spirit Association for the Unification of World Christianity (Unification Church) and four persons asserting membership therein and claiming the right to solicit funds for the organization. Defendants are the two state officials charged with enforcement of the Act.
 Notice of appeal was filed by the defendant attorney general and the defendant commissioner of securities, department of commerce. A cross-appeal was filed by plaintiffs, complaining of the ruling that the Act was valid as to non-religious organizations. Because plaintiffs were wholly successful in obtaining an injunction prohibiting enforcement of the Act against them, the cross-appeal will be considered only insofar as the issues decided may be pertinent to ruling on the appeal.
 We are in general agreement with most of the basic conclusions of Judges Lord and Renner, and affirm those rulings. We disagree, however, with some aspects of the disposition of the case, and remand for further proceedings.
 All parties agree that the major legal issue in this case is whether the classification made in a religious exemption contained in the Act is invalid because of its unequal application to different religious organizations. We agree with the judges below that the classification is invalid and that the exemption should be expanded to cover all religious organizations.
 Contained in the Act is an exemption from certain registration and disclosure requirements for
 (a) religious society or organization which received more than half of the contributions it received in the accounting year last ended (1) from persons who are members of the organization; or (2) from a parent organization or affiliated organization; or (3) from a combination of the sources listed in clauses (1) and (2). Minn.Stat. § 309.515(1)(b).
 Subject to exceptions not material at this time,[2] religious organizations qualifying for the exemption need file neither a registration statement, § 309.52, nor an annual report-financial statement, § 309.53, with the securities division of the department of commerce. All other provisions of the Act apply irrespective of any exemption from registration and filing annual statements.
 The court below initially granted plaintiffs' motion for a preliminary injunction and denied defendants' motion to dismiss. Plaintiffs then moved for summary judgment, seeking final ruling that the Act was unconstitutional. Plaintiffs assert that the Act is unconstitutional on its face and as applied to the solicitation of funds by members of a religious or non-religious organization.[3] Defendants resisted the motion and filed a cross-motion for partial summary judgment, contending that certain of plaintiffs' challenges were not justiciable.
 We affirm the district court's ruling that the plaintiffs have standing to assert the facial invalidity of the Act, including the classification made in the religious organization exemption.Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court (citations omitted). In these First Amendment contexts, the courts are inclined to disregard the normal rule against permitting one whose conduct may validly be prohibited to challenge the proscription as it applies to others because of the possibility that protected speech or associative activities may be inhibited by the overly broad reach of the statute. Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980).
 In Schaumburg, as in the case at bar, there was "an unresolved factual dispute concerning the true character of (plaintiff) organization." l.c. 633, 100 S.Ct. l.c. 834. Thus, regardless of the ultimate determination of plaintiffs' status (religious or non-religious), the nature of the statute called into question by plaintiffs and the nature of their challenge gives them standing to maintain suit.
 We need not in this case decide whether it would be valid to divide religious organizations, like fraternal, patriotic, social, educational, alumni, professional, trade, or learned societies, § 309.515(1)(d), into two classifications: groups funded solely from internal sources and groups funded partly or wholly from public solicitations. Membership funding may have built-in safeguards and opportunities for informing contributors whereas solicitation from the public, lacking such safeguards, arguably needs greater public disclosure. The sticking point in this case is the unique classification dividing religious organizations between (1) groups relying primarily on internal funding but also possibly obtaining large amounts and percentages of income from public funding from (2) groups which look to the public for "more than half" of their funding.
 We turn to the constitutional implications of this disparate treatment of religious sects. The First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion ..." Some forty years ago it was ruled that this clause applies to state legislative enactments as well as to federal action. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). In the landmark Establishment Clause decision it was thereafter stated:
 The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another ... (The) Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers ... State power is no more to be used so as to handicap religions than it is to favor them. Everson v. Board of Education, 330 U.S. 1, 15, 18, 67 S.Ct. 504, 511, 513, 91 L.Ed. 711 (1947).
 It has been stated as a fundamental proposition that "(t)he government must be neutral when it comes to competition between sects." Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1951).
 The nondiscrimination principle, in the religious context, has been formulated by the second Justice Harlan as follows:
 
 
 1
 In any particular case the critical question is whether the scope of the legislation encircles a class so broad that it can be fairly concluded that (all groups that) could be thought to fall within the natural perimeter (are included). Welsh v. United States, 398 U.S. 333, 357, 90 S.Ct. 1792, 1805, 26 L.Ed.2d 308 (1970 concurring opinion), citing Walz v. Tax Comm'n, 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970 separate opinion).
 
 
 2
 It is most difficult, if not impossible, in the present case to ascertain any basis for holding that the separate treatment of various religious organizations in the exemption provision of the Act follows any "natural perimeters" of public policy concerns. The need for public information would seemingly apply equally to religious organizations obtaining 40 and 60 percent of their funding from the public. It is not difficult to imagine a situation in which a religious organization which obtains 40 percent of its funding from the public obtains a substantially higher dollar amount from the public than does a religious organization which obtains 60 percent of its funding from the public. The special burdening of the latter group is in question.
 
 
 3
 The statutory discrimination between such organizations smacks of "religious gerrymandering,"[4] an apparently intentional favoritism for the religious organizations obtaining some but less than half of their funds from the public. As further discussed, it may be inferred that the draftsmen of this legislation wished to reduce the burdens otherwise imposed on well-established churches which had achieved strong but not total financial support from their members; the draftsmen have exhibited less concern for easing regulations applicable to churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members. Actual discrimination exists if, as we assume, there are church organizations in both categories; intentional discrimination is a very real issue, in the absence of any explanation for the sizable loophole created for some religious organizations.
 
 
 4
 We would be somewhat more comfortable with our conclusion if the record reflected, or judicial notice could ascertain, that there are in fact specific denominations in the category of churches receiving substantial public funding, amounting however to less than half their income. All other judges who have viewed this issue (the federal judges in Minnesota and three tiers of state court judges in North Carolina, Heritage Village Church and Missionary Fellowship, Inc. v. State of North Carolina, 40 N.C.App. 429, 253 S.E.2d 473 (1979) and 299 N.C. 399, 263 S.E.2d 726 (1980)), have assumed or taken judicial notice that there are such churches. In the absence of argument to the contrary from the state officials here, we make the same assumption and conclude that real discrimination exists.
 
 
 5
 The inexplicable religious classification in the present case would seem dispositive, if the Court is bound to apply the "ringing phrases" of Everson,[5] the Zorach insistence on neutrality, and the Harlan test of uniformity in classification. We look to further recent cases, however, for confirmation of our direction, because we recognize that the Everson and Zorach statements appeared in decisions which rejected Establishment Clause challenges.
 
 
 6
 The Supreme Court has developed a three-prong test which constitutes a "convenient, accurate distillation" of its "efforts over the past decades to evaluate a wide range of governmental action challenged as violative of the constitutional prohibition against laws 'respecting an establishment of religion,' and thus (has) provide(d) the proper framework of analysis for the issues presented in the case before us." Meek v. Pittenger, 421 U.S. 349, 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975).
 
 
 7
 First, the statute must have a secular legislative purpose. E. g., Epperson v. Arkansas, 393 U.S. 97 (89 S.Ct. 266, 21 L.Ed.2d 228). Second, it must have a "primary effect" that neither advances nor inhibits religion. E. g., School District of Abington Township v. Schempp, 374 U.S. 203 (83 S.Ct. 1560, 10 L.Ed.2d 844). Third, the statute and its administration must avoid excessive government entanglement with religion. E. g., Walz v. Tax Comm'n, 397 U.S. 664 (90 S.Ct. 1409, 25 L.Ed.2d 697).
 
 
 8
 Meek restates tests first announced in Lemon v. Kurtzman, 403 U.S. 602, 612-3, 91 S.Ct. 2105, 2111 (1971). The Lemon tests have become general standards, frequently applied. Stone v. Graham, --- U.S. ----, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).
 
 
 9
 There can be little question that the Minnesota Act, viewed as a whole, has a valid secular purpose. The legislative intent underlying the measure appears from the face of the Act to be the prevention of fraudulent and deceptive conduct in the solicitation of funds in the name of charity and the disclosure of facts which may be useful to the public, when evaluating such solicitations. See Heritage Village Church and Missionary Fellowship, Inc. v. State of North Carolina, supra, 263 S.E.2d at 731 (N.C.1980). Such purpose is within the ambit of the state's police power.
 
 
 10
 The exemption provision of the Act, § 309.515, without considering the detailed classifications, also appears generally to serve the valid purpose of freeing from regulation certain organizations for which public disclosure of funding would not significantly enhance the availability of information to contributors. Among the groups exempted, as mentioned above, are those such as patriotic and fraternal societies which limit solicitation to voting members and certain charitable organizations which do not solicit in excess of $10,000 annually from the public. The safeguards attending membership funding have been mentioned; the small annual dollar amount collected by the exempted charitable organizations, in combination with the other requirements expressed in the provision, such as the use of volunteer solicitors, may be said to offset the legislatively perceived need for public disclosure at the state level. Educational institutions which are supervised by a state board or a national accrediting association are exempted; private foundations which solicit from fewer than 100 persons are exempted; and charitable organizations which solicit for a person named at the time of the solicitation and which transfer all funds without restriction to that person are also exempted. A valid, secular legislative purpose may be discerned for each of these exemptions.
 
 
 11
 No such sound and justifiable purpose can be found in the system of classifying religious organizations. On the contrary, as previously suggested, the exemption of organizations which conduct substantial public solicitations, if such solicitations account for less than half of the organization's income, appears to be designed to shield favored sects, while continuing to burden other sects. The classification has no ascertainable "secular legislative purpose" and does not survive the first portion of the Lemon test.
 
 
 12
 The defendants, relying on Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), urge that a generally valid secular purpose, such as the avoidance of unnecessary regulation, defeats an Establishment Clause challenge to a statute, even though the burdens may fall more heavily on certain religious groups. Petitioners in Gillette claimed exemption from military service under § 6(j) of the Military Selective Service Act which exempted from service in the armed forces any person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." Petitioners challenged the section as violative of the Free Exercise and Establishment Clauses. Petitioners' contention was that "the special statutory status accorded conscientious objection to all war, but not objection to a particular war, works a de facto discrimination among religions." l.c. 451-52, 91 S.Ct. l.c. 837. For example, it was argued that some religious faiths distinguish between "just" and "unjust" wars. 401 U.S. at 452, 470, 91 S.Ct. at 837-846 (dissent). Thus it was said that some conscripts might be forced to serve in violation of religious scruples, whereas a member of another sect, having more generalized objections toward all wars, would be exempted from service. Having found that the statute on its face did not discriminate on the basis of religious affiliation, the Supreme Court considered whether there had been some subtle departure from governmental neutrality. In determining that there had been no such departure, the Supreme Court found that petitioners had failed to make the requisite showing of the absence of a neutral, secular basis for the line drawn between objectors to all wars and objectors to a particular war. l.c. 452, 91 S.Ct. l.c. 837. The Court sustained the legislative exemption, relying on the difficulty of devising a standard to cover a "virtually limitless variety of beliefs," petitioners' failure to articulate a feasible scheme of exemption, and the increased danger of government entanglement with religion and of erratic decisionmaking if a broadened exemption were devised. l.c. 453-58, 91 S.Ct. l.c. 838-840.
 
 
 13
 Defendants' reliance on Gillette is clearly misplaced. The challenged statute in this case expressly separates two classes of religious organizations and makes the separation for no valid secular purpose that has been suggested by defendants. Inexplicable disparate treatment will not generally be attributed to accident; it seems much more likely that at some stage of the legislative process special solicitude for particular religious organizations affected the choice of statutory language. The resulting discrimination is constitutionally invidious.
 
 
 14
 If it be necessary to apply the second part of the Lemon test to the exemption provision of the Act, we conclude that a significant effect of the classification made within the religious exemption section could be to assist (by deregulation) certain religious groups, while burdening others. The benefit conferred on religious organizations that do not fall subject to the registration and disclosure requirements of the Act constitutes a substantial advantage; the burden of compliance with the Act is certainly not de minimis.
 
 
 15
 The registration section, § 309.52, requires, prior to any solicitation, that groups subject to the Act file with the state a detailed registration statement on forms provided by the state.[6] Providing the items of information listed in the statute is not an insignificant undertaking, especially in view of the open-ended provision of subsection (1)(p) for "(s)uch other information as the department may ... require ..." A group filing for the first time must provide, in addition to the registration statement, "a financial statement of its operation for its most recent 12 months." § 309.52(2).
 
 
 16
 The financial statement expected of first-time filers becomes an annual obligation under § 309.53, which mandates an annual report on state forms accompanied by a financial statement.[7] Such statements must contain the following: total receipts and income; costs of management, fund raising, and public education; and funds transferred out of the state and remaining within the state with a breakdown of disbursement or dedication. In the words of another court considering a substantially equivalent statute,
 
 
 17
 However commendable as a sound business practice, such an audit does not spring full blown without considerable expense and administrative coordination.[8] Heritage Village and Missionary Fellowship, Inc. v. State of North Carolina, supra, 263 S.E.2d at 733 (N.C.1980).
 
 
 18
 It is manifest that certain religious groups will suffer material burdens as a result of the obligations imposed by the Act and that certain other religious groups, not subject to the Act by virtue of the predominance of membership funding, will enjoy complete exemption from the demands of registration or disclosure. We must conclude that the Minnesota statute prefers some religions over others. Such preference is in conflict with the amendment prohibiting establishment of religion by law, in the absence of compelling secular justifications like those sustained in Gillette.
 
 
 19
 In light of our conclusion that the classification made in Minn.Stat. § 309.515(1)(b) significantly burdens some religious groups and has no saving secular purpose, we need not examine the exemption for excessive government entanglement with religion, the third consideration in the Supreme Court's framework of Establishment Clause analysis.
 
 
 20
 Having approved of the district court's major holding, invalidating the religious classifications in the exemption section of the Act, we further conclude that the decision below is sound in its determination that all sects are entitled to claim the religious organization exemption, disregarding the invalid classification. It would be logically possible to strike the entire religious exemption as unconstitutional, rather than enlarge the exemption to cover all religious organizations. We believe the district court exercised good judgment, in accordance with probable legislative intent, in selecting the least disruptive method of editing the Act to eliminate an unconstitutional provision.
 
 
 21
 Under the rule of severability (Minn.Stat. § 309.61) the surviving provision in the exemption section will comprehensively apply to "a religious society or organization." We recognize that the resulting legislative scheme could be questioned as favoring all religious organizations over others. In light of the traditional governmental reluctance to intrude unnecessarily in the affairs of religious organizations, and the absence of parties ready to litigate the issue posed, we do not question the broadened exemption provision.
 
 
 22
 Contrary to an assumption made below in dealing with the intricacies of this rather complex statute, the exemption does not apply to the entire Act. Portions of the Act still literally apply to religious organizations.[9] The injunction is thus overly broad. In the absence of full consideration and final rulings below, we do not discuss possible constitutional issues regarding the remaining sections, as applied to all religious organizations. A cautious approach to such issues is mandated by NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Note however, Christian Echoes National Ministry, Inc. v. United States, 470 F.2d 849 (10th Cir. 1972), cert. denied, 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973); Securities and Exchange Commission v. World Radio Mission, Inc., 544 F.2d 535 (1st Cir. 1976); In re Rabbinical Seminary, 450 F.Supp. 1078 (E.D.N.Y.1978), for applicability of disclosure requirements to the financial and political activities of religious organizations.
 
 
 23
 The validity of the regulation of all charitable solicitation as such need not be closely considered at this time to determine if the dicta favorable to such regulation in Village of Schaumburg, supra 444 U.S. at 637-8, 100 S.Ct. at 836-838, is sound and controlling here. The views of the district court on this subject were expressed without benefit of the Schaumburg decision. In any event, on remand, the parties will have an opportunity to focus their contentions on these and other provisions of the Act which have received only marginal attention, and will have the guidance of Schaumburg in making such examination.
 
 
 24
 The ruling that plaintiffs and others "claiming" to be religious organizations should enjoy the religious exemption and should be free from all regulation under the Act does not appear to be justified, and that much of the injunctive order is also disapproved. A "bare assertion ... without the production of any evidence ... is simply not sufficient to sustain (an) assertion that (the Unification Church) is a religious organization." United States v. Berg, 636 F.2d 203 (8th Cir., 1980). Plaintiffs' claims should not be accepted without inquiry. The parties should have an opportunity to develop the record and obtain rulings below. It may be observed, however, that a considerable burden is on the state, in questioning a claim of a religious nature. Strict or narrow construction of a statutory exemption for religious organizations is not favored. Washington Ethical Society v. District of Columbia, 249 F.2d 127, 129 (D.C.Cir.1957, Burger, J.). Judicial determination of religious sincerity and status is a most sensitive undertaking, but is not without precedent. Gillette, supra 401 U.S. at 457, 91 S.Ct. at 840 (whether a belief is "truly held" is open to question, the "truth of a belief" is not); Wisconsin v. Yoder, 406 U.S. 205, 219-29 and 235, 92 S.Ct. 1526, 1535-1540 and 1543, 32 L.Ed.2d 15 (1972) (sincerity of religious belief demonstrated by conduct); Founding Church of Scientology v. United States, 409 F.2d 1146, 1162 (D.C.Cir.1969), cert. den., 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969) (declining to hold summarily that plaintiff is a religion; claim of religious status is subject to contradiction by showing of insincerity of beliefs). Cf. Walker v. Wegner, 477 F.Supp. 648, 652 (D.S.D.1979) (preliminary injunction granted against a statutory scheme involving administrative determination of "whether a particular cause is religious"), affirmed on other grounds, 624 F.2d 60 (8th Cir. 1980).
 
 
 25
 In summary, we agree with the district court's holding that plaintiffs have standing to challenge the classification made in the exemption section of the Act, as it pertains to religious organizations; we agree with the court's invalidation of the classification made in that section; we agree that the exemption section should apply to all religious organizations, subject to possible legislative revision; we disagree with the conclusion that no part of the Act may be applied to religious organizations, but leave open questions of construction and validity for further development, including the application of the Act to charitable organizations; and we disagree with the conclusion that plaintiffs and others claiming the religious exemption should automatically enjoy such exemption, but leave open the question of plaintiffs' status for further development.
 
 
 26
 The judgment below is vacated and the cause remanded for entry of a modified injunction and further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Miles W. Lord, United States District Judge. Judge Lord's order followed the recommendation of former magistrate, now United States District Judge, the Honorable Robert G. Renner
 
 
 [2]
 The religious exemption cannot be invoked if the organization employs a professional fund raiser, § 309.515(2), or has had its exempt status revoked by the department of commerce, § 309.515(3)
 
 
 [3]
 In the district court and on appeal there has been wide-ranging discussion of constitutional issues. This Court has entered an order limiting consideration of issues on appeal. Recognizing the gravity of constitutional adjudications, our decision is confined to the major substantive issue set forth above, and the matters expressly discussed in this opinion. While not prejudging any other issues, we note Judge Renner's comments that the Act has been in effect since 1961, that religious organizations were exempt prior to 1978, and that the legislation has operated without any other controversy requiring judicial interpretation or validation
 
 
 [4]
 The term is used in Gillette v. United States, 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971) to describe a "subtle departure from neutrality" between sects. In the present case, the departure from neutrality may be less than "subtle" in nature as will be shown, it has been quickly recognized by most judges who have viewed this type of legislation
 
 
 [5]
 Justice Blackmun's characterization, in his dissenting opinion as Circuit Judge in In re Weitzman, 426 F.2d 439, 448 (8th Cir. 1970)
 
 
 [6]
 § 309.52 Registration requirement
 Subdivision 1. No charitable organization, except as otherwise provided in section 309.515, shall solicit contributions from persons in this state by any means whatsoever unless, prior to any solicitation, there shall be on file with the department upon forms provided by the department, a registration statement containing, without limitation, the following information:
 (a) Legally established name.
 (b) Name or names under which it solicits contributions.
 (c) Form of organization.
 (d) Date and place of organization.
 (e) Address of principal office in this state, or, if none, the name and address of the person having custody of books and records within this state.
 (f) Names and addresses of officers, directors, trustees, and chief executive officer.
 (g) Federal and state exempt status.
 (h) Denial at any time by any governmental agency or court of the right to solicit contributions.
 (i) Date on which accounting year of the charitable organization ends.
 (j) General purposes for which organized.
 (k) General purposes for which contributions to be solicited will be used.
 (l) Methods by which solicitation will be made.
 (m) Copies of contracts between charitable organization and professional fund raisers relating to financial compensation or profit to be derived by the professional fund raisers. Where any such contract is executed after filing of the registration statement, a copy thereof shall be filed within seven days of the date of execution.
 (n) Board, group or individual having final discretion as to the distribution and use of contributions received.
 (o) The amount of total contributions received during the accounting year last ended.
 (p) Such other information as the department may by rule or order require to promote fairness of the solicitation and to assure full and fair disclosure of all material information to the department.
 Subd. 2. The first registration statement filed by a charitable organization shall include a financial statement of its operation for its most recent 12 month period immediately preceding the filing of the first registration statement.
 
 
 [7]
 § 309.53 Annual report
 Subdivision 1. Except as otherwise provided in subdivision 1a of this section, every charitable organization required to file a registration statement pursuant to section 309.52 shall file an annual report with the department of commerce upon forms provided by the department or on forms identical thereto on or before June 30 of each year if its books are kept on a calendar year basis. For cause shown the department may extend the time for filing the annual report for a period not to exceed three months.
 Subd. 2. Such annual report shall include a financial statement covering the immediately preceding 12 months period of operation, and shall be executed by any two duly constituted officers of the charitable organization, who shall acknowledge that it was executed pursuant to resolution of the board of directors or trustees, or if there be no such board, then by its managing group which has approved the content of the annual report.
 Subd. 3. The financial statement shall include a balance sheet, statement of income and expense, and statement of functional expenses, shall be consistent with forms furnished by the department, and shall be prepared in accordance with generally accepted accounting principles so as to make a full disclosure of the following, including necessary allocations between each item and the basis of such allocations:
 (a) Total receipts and total income from all sources;
 (b) Cost of management and general (sic);
 (c) Cost of fund raising;
 (d) Cost of public education;
 (e) Funds or properties transferred out of state, with explanation as to recipient and purpose;
 (f) Total net amount disbursed or dedicated within this state, broken down into total amounts disbursed or dedicated for each major purpose, charitable or otherwise;
 (g) Names of professional fund raisers used during the accounting year and the financial compensation or profit resulting to each professional fund raiser. Unless otherwise required by this subdivision, the financial statement need not be certified. * * *.
 
 
 [8]
 Defendants belittle the authority of the North Carolina litigation, pointing to the close division of judges on the North Carolina Supreme Court. We are impressed, however, that the trial judge (now Judge Ervin of the United States Court of Appeals for the Fourth Circuit) and the intermediate appellate court (in an opinion authored by a present United States District Judge) anticipated the majority ruling of the North Carolina Supreme Court. First Amendment jurisprudence is a responsibility of state court judges as well as federal judges. While our analysis differs somewhat from the rationale of the North Carolina courts, at least in form, we acknowledge that we are strengthened in our conclusion by the North Carolina resolution of issues which are essentially identical with those at bar
 
 
 [9]
 For example, deceptive names and practices are forbidden, the sale of contributor lists is forbidden, and solicitors must supply tax deductibility information to contributors. Minn.Stat. §§ 309.55(1)(5)(6), 309.556(b)