## STRAITS OF DOVER S. S. CO., Limited, v. MUNSON.

(District Court, S. D. New York. June 22, 1899.)

**1. SHIPPING—TIME CHARTER—RETURN CARGO.**

A charter of a steamer for a term of three months at a monthly hire based on her tonnage, which gave the charterer the right to send her to any ports in certain named countries, from which it was customary for vessels to bring return cargoes, must be construed in the light of such usage, and as authorizing the charterer to make at least one complete voyage with return cargo, and he would not be compelled to return her unladen for the purpose of making delivery of her by the expiration of the term, where she was not delayed through his fault or negligence.

**2. SAME—EXTRA HIRE—RISKS OF DELAY.**

A charter of a vessel for a term of three months to be sent to any ports in designated countries at the option of the charterer provided for the payment of monthly hire based on her tonnage, payable semimonthly in advance, and for the same rate for any part of a month, "hire to continue until her delivery," and that, should the steamer be on her return voyage towards the port of return delivery at the time a payment of hire became due, such payment should be made for the estimated time before delivery and afterwards adjusted. *Held*, that such provisions contemplated the use of the vessel by the charterer for at least one complete voyage, taking any customary return cargo from the customary ports at the charter rate of hire, where a prolongation of such voyage beyond the charter time was not due to any negligence on the part of the charterer; each party taking the risks of delay from causes beyond the control of either.

In Admiralty. Libel to recover extra compensation for the use of a vessel after the expiration of the charter period.

Convers & Kirlin, for libelant.

Wheeler & Cortis, for respondent.

BROWN, District Judge. The above libel was filed to recover $5,-362.72 claimed to be owing as extra compensation for the use of the steamship Straits of Dover for a period of 2 months 23 days and 8 hours after the expiration of the charter period.

The charter was dated July 28, 1898, and let the steamer to the respondent for the period of "three calendar months from August 1, 1898, to be delivered at Philadelphia, and to be employed in carrying lawful merchandise, etc., between any safe ports in the United States, West Indies, Mexico, Cape Verdes, Azores, and for north coast South America, excluding Brazil, as the charterers shall direct."

The steamer was delivered in accordance with the charter at Philadelphia, on August 1st, was loaded with a cargo of coal for Tampico, Mexico, sailed on August 5th, and arrived at Tampico on August 16th. Owing to extraordinary washouts on the railroad for which the coal was designed, no berth could be obtained at Tampico until October 5th. Her cargo was discharged on October 18th, and on that day she left Tampico for the port of Tuxban, where she arrived on October

19th to take on a cargo of logs, which had been engaged for her return trip in September. In consequence of very bad weather, the loading at Tuxban was greatly delayed, and the owners being very pressing for the return of the steamer, she left Tuxban before taking on the entire cargo of logs, on December 20th, but was obliged to go to Vera Cruz for bunker coal. On December 27th she left Vera Cruz for Progresso for about 2,000 bales of hemp, where she arrived on December 29th. After taking on the hemp she sailed for New York on January 10th, arrived there on the 20th and completed her discharge and was redelivered to the owners on January 24th, 2 months 23 days and 8 hours after the expiration of the term of three months provided for in the charter.

The charter hire specified in the charter was 5 shillings and 9 pence sterling per gross registered ton per calendar month, payable semimonthly in advance. After the expiration of the charter period on November 1st the current market rate for steamers of this class, as claimed by the libelant, was 8 shillings and 6 pence. The libelant demanded payment at that rate after November 1st. The respondent contends that under other provisions of the charter he is liable for this period at the rate of 5 shillings and 9 pence only and that sum was paid by him and received by the libelant without prejudice to its claim for the balance, in case it should be determined that the latter is entitled to a higher rate after November 1st.

The decision of the question presented depends upon the construction to be given to the following paragraphs of the charter party:

"(4) That the charterers shall pay for the use and hire of the said vessel five shillings and nine pence (5/9) British sterling per gross Reg. ton per calendar month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery in like good order and condition to the owners (unless lost) at a port in U. S. North of Hatteras.

"(5) That should the steamer be on her voyage towards the port of return delivery at the time a payment of hire becomes due, said payment shall be made for such a length of time as the owner or their agents, and charterers, or their agents, may agree upon as the estimated time necessary to complete the voyage, and when the steamer is delivered to owner's agents any difference shall be refunded by steamer or paid by charterers, as the case may require."

The contention of the libelant is that the above clauses do not authorize the charterer to detain the vessel beyond the specified period of three calendar months by any voluntary act on the part of the charterer, or his agent; that notwithstanding the extraordinary delay in the discharge of the outward cargo, yet inasmuch as she was fully discharged and ready to sail from Tampico on the 18th of October, in time to reach New York or some port north of Hatteras by November 1st, the charterer was bound to do so at the risk of paying the market value of the steamer for any subsequent delay; that the subsequent detentions all arose through the charterer's desire to take in a return cargo at several Mexican ports, and that this being his voluntary action was at his risk, and that he is therefore liable for the full market value for the consequent delay.

I think this argument would be sound and conclusive if it could be deemed consistent with the reasonable intention of the charter as a

whole, and the specific provisions of paragraphs 4 and 5, above quoted. But these provisions, as well as the general purpose of the charter, seem to me inconsistent with the libelant's claim.

1. The general purpose of the charter must be understood in accordance with common usage, and that certainly includes a return cargo on voyages between the ports mentioned in this charter. This vessel accomplished under the charter but one single round trip. The charter gave the option of voyages to the West Indies; and in the ordinary course, three months was time enough for two of such voyages with return cargoes on each. The charter must be understood as contemplating at least one complete voyage to any of the places named, with a return cargo in the customary manner usual upon trips to those particular places. If any express evidence of this were necessary, it is supplied by the testimony of Mr. Geer, who testifies not only to the custom in this regard, but that the ports visited were the customary ports for taking on the usual return cargo of logs, lumber and hemp.

There is no charge, nor is there any evidence to indicate, that any of the delays at either of the ports in Mexico were caused through any negligence of the charterer, or his agent, or through any lack of diligence in the endeavor to expedite the vessel both in discharging her outward cargo and taking on board the return cargo; so that the question involved is reduced to the simple one whether the respondent by the terms of the charter was forbidden to take on a return cargo after the discharge was finished on the 18th of October, there being time only for a return without cargo, if the vessel was bound to reach her return port by November 1st. Such a construction of the charter, even aside from provisions 4 and 5, would seem to me to be a somewhat extraordinary one, and presumptively contrary to the intention of the parties.

2. It is evident from paragraph 4 that a prolongation of the voyage beyond the charter period of three months was contemplated at the same rate. It declares that "the same rate shall continue for any part of a month and until delivery of the vessel." The word "hire" in this paragraph evidently means the amount to be paid, as is evident from the context, which in paragraph 6 declares that payment "of said hire" shall be made in cash at the current short-sight rate of exchange. Paragraph 5 also equally plainly contemplates the use of the vessel beyond the charter period of three months. It refers to her voyage "towards the port of return delivery," and evidently means the time when, the charter period having expired, a further payment in advance would become due by the necessary prolongation of the charter period in accordance with paragraph 4; and the intention of paragraph 5 is, that at that time the payment need not necessarily be a semimonthly payment, but only for the estimated time necessary to complete the voyage and the delivery of the ship.

The reasonable inference as to the intention, to be drawn from these circumstances is, that the charterer should be authorized to make use of the vessel, at the rate agreed upon, for at least one complete voyage, taking any customary return cargo at the customary

ports; and that any prolongation of the charter period in accomplishing the voyage and in taking a return cargo, not caused through any negligence or lack of diligence of the charterer, or his agent, must be deemed governed by paragraphs 4 and 5, and not subject to any increased rates. I do not see anything in this contract that places the risk of delay through causes beyond the control of the parties upon the one party more than upon the other, either as respects the discharge of the outward cargo, or the shipping of the return cargo. Each party takes the risk incident to his contract, and such loss as may incidentally attend it. Had the rate of freight gone down after November 1st, the charterer would still have been entitled to the same charter rate. Had the charter been an absolute agreement to return the vessel at a fixed day, the result would have been quite different. The only reasonable construction of clauses 4 and 5 is, that they were expressly intended to provide for a prolongation of the charter period at the same rate, in order to give to the charterer, so far as necessary, the benefit of at least one voyage to either of the ports named, with a customary return cargo, and to include, as incident to such a voyage, the risk of all such detentions as should not be due to the charterer's fault.

The libel is therefore dismissed, without costs.