WONG WING FAI COMPANY, S.A., Plaintiff/Appellant,

v.

UNITED STATES of America, Defendant/Appellee.

No. 86-2515.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 1987.

Decided Feb. 29, 1988.

Mattaniah Eytan, Kaplan, Russin, Vecchi, Eytan & Collins, San Francisco, Cal., for plaintiff/appellant.

Paul Gary Sterling, Dept. of Justice, Civ. Div., Torts Branch, San Francisco, Cal., for defendant/appellee.

Before NORRIS and NOONAN, Circuit Judges, and STEPHENS, Jr.,[*] District Judge.

STEPHENS, Senior District Judge:

This appeal involves a time charter between the plaintiff, Wong Wing Fai Company, owner and operator of the oil tanker VIRA 8, and the defendant, the Military Sealift Command of the United States Navy (hereinafter usually referred to as "the Navy"). The district court had jurisdiction under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752. We have jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

## BACKGROUND

In March of 1975 the chartered vessel, the VIRA 8, entered Vietnamese waters with the shipowner's knowledge that maritime insurance companies considered the area a war zone. The VIRA 8 was insured under a private war risk insurance policy until April 27, 1975.[1] On April 9, three weeks before the fall of the Republic of Vietnam (South Vietnam) to North Vietnamese forces, the plaintiff and the Navy signed a letter agreement chartering the VIRA 8 to the Navy to facilitate supplying fuel oil to the Navy's ships operating in Vietnamese waters in connection with the evacuation of South Vietnam. Although both parties intended that the letter agreement would be superseded by a more formal document, a formal contract was never prepared due to the exigencies of the military situation. The letter agreement did not specify a termination date for the charter.

On April 23, Thai Sung Chhun, the representative of the shipowner, requested that the charter be cancelled. Thai testified that he made this request because the cost of renewing the vessel's war risk insurance for another week after April 27 would have exceeded the amount of charter hire the VIRA 8 could earn in the same period and because the shipowner had entered into another charter that called for delivery of the VIRA 8 in Singapore on May 15. At the time this request was made, the ship was fully loaded with a cargo of fuel oil belonging to the Navy. The Navy agreed to cancel the charter effective April 25. Both parties expected to be able to discharge the cargo on or before that date. However, the rapidly deteriorating military situation prevented discharging the cargo and the VIRA 8 continued to move from place to place as the Navy directed while the Navy tried to find a place where the cargo could be discharged.[2]

On April 30, 1975, South Vietnam fell to the North Vietnamese. While the ship was five miles off shore awaiting instructions from the Navy, 110 fleeing South Vietnamese soldiers commandeered the ship. Af-

---

[*] Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

1. Unless otherwise specified, all dates refer to the year 1975.

2. On April 23, the day on which the parties agreed to terminate the charter the VIRA 8 was at Newport, a port in Saigon on the Saigon River. On April 26, pursuant to an agreement between the Navy and the appellant, the VIRA 8 proceeded to Vung Tau, an anchorage in the South China Sea about thirty miles from the mouth of the Saigon River. At Vung Tau the vessel anchored off shore while waiting for further instructions from the Navy. On April 29,

the Navy instructed the vessel to proceed to Nah Be in order to discharge the cargo at either the Shell or Esso depot. Nah Be was a Navy storage depot on the Saigon River about ten miles south of Saigon. The master attempted to comply, but when only thirty minutes from Vung Tau, South Vietnamese military officials refused to let the vessel proceed up river to Nah Be. The VIRA 8 returned to Vung Tau and waited for new instructions. The Navy attempted to contact the master to tell him that permission to proceed up river had been obtained from the South Vietnamese Navy, but at that time communications between Saigon and Vung Tau were no longer possible.

ter this event, the Navy no longer controlled the ship's movement. The soldiers ordered the master to sail to Singapore. Singapore refused to let the vessel enter the port. The ship returned to Vietnam, and on May 8, 1975 the forces of North Vietnam took possession of both the ship and its cargo.

On March 19, 1976, the shipowner filed suit in the United States district court claiming $280,401.86 for the loss of the vessel, the daily hire rate of $1,400 per day from April 9, 1975 through April 30, 1975, and lost profits from April 30 through May 9, 1975. The United States filed a counterclaim seeking to recover $161,214.60 for the loss of the Navy's 15,095 barrels of fuel oil.

The district court entered judgment for the plaintiff shipowner on July 30, 1986, allowing only the shipowner's claim for charter hire for the seventeen days from April 9, the date of the charter agreement, through April 25, the agreed cancellation date. The district court also denied the government's counterclaim. The shipowner appealed the district court's denial of recovery for loss of the vessel, charter hire from April 26 through April 30, and lost profits. The appeal is timely. The government has abandoned its counterclaim.

We reverse the district court's denial of charter hire for the five days from April 26 through April 30 but affirm the judgment in all other respects.

## DISCUSSION

### I. The Effect of the Agreement to Terminate the Charter

The district court found that the parties agreed to terminate the charter on April 25, 1975. We do not question this determination. However, appellant claimed that the charter could not terminate so long as the Navy's cargo was on board. The effect of the agreement when the government's cargo was still aboard the ship is a question of law reviewable de novo. *See Dunn v. Phoenix Newspapers, Inc.,* 735 F.2d 1184, 1186 (9th Cir.1984).

Whether the presence of the charterer's cargo on board extends the charter beyond the cancellation date is an issue which involves the doctrine of overlap.[3] Through the doctrine of overlap, "[t]he courts have recognized that redelivery [of the ship to its owner] on [a] specified day is often impracticable considering the exigencies of the maritime industry...." 2B BENEDICT ON ADMIRALTY, § 2, at 1–14 (M. Cohen Ed.1986). *See also* G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY 231–32 (1975). Under the doctrine, if a voyage is uncompleted when the termination date arrives, the time charter does not terminate until the conclusion of the voyage. *Id.* at 232. *See Straits of Dover S.S. Co. v. Munson,* 95 F. 690, 693 (S.D.N.Y.1899), *aff'd* 100 F. 1005 (2d Cir. 1900). The courts will treat the charter as extended for such period of time as is reasonable under the particular circumstances. *Straits of Dover,* 95 F. at 692–93. A charter is extendable if circumstances beyond the control of the parties and outside of the provisions of the charter make it impossible to complete the voyage as contemplated, and a reasonable extention is granted as a matter of course. Under the facts of this case, the parties were still within a reasonable extension period when the fleeing South Vietnamese soldiers commandeered the vessel. For this reason the shipowner is entitled to the daily charter hire rate through April 30.[4]

---

**3.** Appellant cites several cases to support its theory that termination is not effective if the charterer's cargo is still on board the vessel. *Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d 188 (9th Cir.1962); *Ocean Cargo Lines Limited v. North Atlantic Marine Co.,* 227 F.Supp. 872 (S.D.N.Y.1964); *Luckenbach v. Pierson,* 229 F. 130 (2d Cir.1915). These cases are inapplicable because they arose from situations where the ship owner had attempted to unilaterally withdraw from the charter.

**4.** We need not decide at what point in time extension of the charter period would have become unreasonable because of our conclusion in section III *infra* that the charter came to an end on April 30 when the fleeing Vietnamese soldiers frustrated the purpose of the charter by commandeering the vessel.

## II. Liability for Loss of the Vessel

The appellant has articulated three theories under which it claims that the United States is liable for the loss of the VIRA 8: 1) negligence, 2) breach of an agreement to provide war risk insurance, and 3) deprivation of the shipowner's constitutional rights to due process under the Fifth Amendment due to the government's failure to include the VIRA 8 in a government indemnification program that covered other ships similarly situated.

### A. Negligence

For appellant to prevail on any of the variations of its negligence theory, it must show that the Navy breached a duty it owed appellant and that this breach of duty was the proximate cause of the loss of the VIRA 8. Appellant bases its negligence claim on the theory that the Navy had a duty to arrange for the discharge of the cargo in a reasonable time, or, alternatively, that the Navy had a duty to direct the VIRA 8 to a safe port.

■ In a time charter such as the one at issue, "absent any special provision or circumstance, the duty to load, stow, and discharge cargo—and the consequences for failing to do so properly—fall upon the ship and her owners." *Nichimen Company v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir. 1972) (note omitted). Both parties agree that special circumstances were present in this case. The district court found that the charter terminated on April 25, but specifically found that after April 25 both parties nevertheless had a duty "to use reasonable efforts to discharge the cargo in a reasonable time and manner." The government agrees that the Navy had a duty to make reasonable efforts to arrange for the discharge of its cargo. Appellant disputes this conclusion of the district court only to the extent that it imposes a duty on appellant. Appellant doesn't dispute that the Navy's conduct should be judged by a standard of reasonableness.[5] Neither the charter nor the agreement to terminate the charter fixed a specific time for discharging the cargo.[6] In such cases, "the law implies an agreement on the part of the charterer to load or discharge the cargo within a reasonable time, and so far as there is a joint duty in loading or unloading, that the merchant [the Navy] and shipowner shall each use reasonable diligence in performing his part." A. MOCATA, M. MUSTILL & S. BOYD, SCRUTTON ON CHARTER PARTIES AND BILLS OF LADING 320–21 (19th Ed. 1984) [hereinafter SCRUTTON ON CHARTER PARTIES] (notes omitted).

■ The district court found that a voyage on April 26 from Newport to Vung Tau was made upon the agreement of the Navy and the ship's master "so that the cargo could be ready for discharge." The district court also found that on April 29 the vessel was instructed to proceed back up the Saigon River to Nah Be "in order to discharge the cargo." The record supports these findings. South Vietnamese military officials refused to let the vessel proceed to Nah Be. It is undisputed that the Navy subsequently arranged for permission for the vessel to proceed to Nah Be. Finally, the record contains ample evidence as to the district court's finding that "all of the ports in the area were exposed to chaotic military, political and commercial conditions" during the relevant period.[7] Be-

---

5. Under the Suits in Admiralty Act the duty imposed on the government is that owed by a private person in similar circumstances. 46 U.S.C. § 742 (1975). This standard only requires the use of due care; the Navy need only have acted reasonably. *Canadian Pacific (Bermuda) Ltd. v. United States*, 534 F.2d 1165, 1168 (5th Cir.1976).

6. Given the factual circumstances of this case, appellant had no legal right to have the Vira 8 delivered on the termination date because of the application of the doctrine of overlap, discussed *supra* in section I.

7. In determining what period of time would have been reasonable for the Navy to arrange for the discharge of its cargo, "[a] reasonable time means reasonable under the circumstances then existing, other than self-imposed inabilities of either shipowner or charterer, and should be estimated with reference to the means and facilities then available at the port." SCRUTTON ON CHARTER PARTIES 321 (notes omitted).

cause these facts which are supported by the record support the district court's finding that the Navy's conduct was reasonable, the finding is not clearly erroneous. Since the Navy's conduct was reasonable, it did not violate any duty to appellant in the course of its efforts to arrange for the discharge of the cargo.

■ Appellant's alternate negligence theory is that the Navy had a duty to direct the ship to a safe port. The district court correctly found that the Navy "did not violate any duties under its agreements with appellant ... in designating the ports for the ship ..." The Navy had no duty to direct the VIRA 8 to a safe port. The only American authority appellants cite for the proposition that the Navy had such a duty is *American President Lines v. U.S.*, 208 F.Supp. 573 (N.D.Cal.1961), which involved a duty specified in the charter agreement. No such duty was set forth in the letter agreement in the instant case. In appropriate circumstances, British courts find that a "safe port" term is implied in a time charter, but in the United States the federal courts have never done so. *See e.g. Brostrom & Son v. Dreyfus & Co.*, 44 Ll.L.R. 136, 138 (1932). In light of the fact that appellant knowingly chartered its vessel to the Navy for use in a war zone, this is not an appropriate case in which to consider applying the British rule.

Because the Navy did not violate any duty owed to appellant, the government is not liable to appellant for the value of the VIRA 8 on a negligence theory.

The shipowner has cited several cases such as *Yone Suzuki v. Central Argentine Ry.*, 27 F.2d 795, 805 (2d Cir.1928), and *Sixteen Hundred Tons of Nitrate Soda v. McLeod*, 61 F. 849, 851–853 (9th Cir.1894), for the proposition that crowded docks do not excuse the charterer's inability to discharge cargo. These cases are not applicable because they did not involve the loss of or damage to vessels and did not involve conditions that could only be brought about by enemy activity in a war zone.

8. Thai Sung Chhun, the shipowner's representative, testified that he requested cancellation of the charter because the costs of extending the war risk insurance on the VIRA 8 would exceed the charter hire rate of $1400 per day. If re-

## B. The Navy Never Agreed to Provide War Risk Insurance

■ Appellant contends that the letter agreement incorporated the material terms of the Navy standard tanker time charter as to which the letter agreement was silent because the letter agreement contemplated that it would be superseded by a more formal charter. Specifically, appellant contends that the letter agreement incorporated by reference Article 33, the war risk insurance term of the standard charter. The district court found that the parties' agreement did not include a promise that the Navy would provide war risk insurance for the VIRA 8. We agree.

The letter agreement was silent as to war risk insurance, and appellant had its own coverage at the time it entered into the agreement. Appellant could have had its coverage extended for another week from the date any extension was requested as late as April 27. Appellant made no attempt to extend its coverage. On the contrary, the owners of the ship made a business decision based upon monetary considerations. They knowingly took a risk by failing to request an extension of their insurance.[8]

The deposition testimony of the three Navy officials most directly involved with chartering the VIRA 8 indicates that no war risk insurance was contemplated for the charter. All three officials testified that they never discussed war risk insurance with any representative of the shipowner.[9]

newed on April 27, the last day that Lloyd's issued quotes for the Vietnam area, appellant could have obtained an additional seven days of coverage on a $250,000 valuation (the value for which appellant had originally insured the VIRA 8) for a premium of 5% of valuation ($12,500). Between April 21 and April 25, the day the parties intended the charter to terminate, insurance was available at 4% ($10,000). Although these rates exceeded the charter hire rate, appellant knew as early as April 25 that the charter was not going to terminate as planned and could have insured against the loss that eventuated.

9. Mac Nhi Kinh was the Navy official who dealt directly with the shipowner's representative,

Appellant has also pointed to the incomplete draft of the formal agreement that was to supersede the letter agreement. This draft is not dispositive but consists of a form copy of the standard formal agreement on which material has been both written in and crossed out. In the margin next to Article 33, the sections containing the "standard" war risk terms, the drafter has written the word "no" and two question marks. This does not militate towards the conclusion that the Navy intended to provide war risk insurance for the VIRA 8.

Because of the ample support in the record, the district court's finding that the Navy did not agree to provide war risk insurance is not clearly erroneous.

## C. The Navy as a Self Insurer

1. *The Acting Secretary of the Navy by Memorandum dated April 10 authorized the Navy to self-insure against war risks in certain situations and did not establish a program entitling the shipowner to indemnification*

■ The shipowner appealed the district court's ruling that the VIRA 8 was not covered by what it has chosen to call an "indemnification program" that it claims covered all other shipowners who had chartered vessels to the Navy for use in the evacuation effort. In fact, there was no "indemnification program." On April 10, 1975, the day after the parties in the instant case signed the letter agreement, the Acting Secretary of the Navy ("the Secre-

tary") issued a memorandum the subject of which was "Authority to indemnify ocean carriers and shipowners against unusually hazardous risks attributable to sailing their ships into war risk areas." [10] The shipowner construes this memorandum as initiating a "benefits" program that "entitled" it to indemnification. The district court made a factual determination that the memorandum authorized indemnification of some shipowners subject to certain conditions, and implicitly made the correlative finding that the memorandum did not create a benefits program entitling contractors to indemnification in certain conditions.[11] This finding is supported by the record and is not clearly erroneous.

The text of the memorandum supports the finding of the district court. The memorandum employs the terms "authority" and "authorization" throughout, most pointedly in the subject heading. The word "program" or its equivalent does not appear. The text of the memorandum does not require the Navy to choose to self-insure with regard to any particular contractor; it permitted the Navy to indemnify specific contractors against war risks if it desired to do so, provided that certain conditions existed. The discretionary nature of the Navy's authority to self-insure is clear from the language of the memorandum: "[i]ndemnification may be provided" under the authority of the memorandum only upon satisfaction of specific conditions, and the memorandum also refers to

Thai Sung Chhun, in the course of preparing the letter agreement. In deposing Mac, appellant's counsel confronted Mac with Thai's answers to interrogations in which Thai claimed Mac stated that the Navy would provide war risk insurance. Mac denied having made any such statements. Even if Mac's recollection of events was incorrect and Thai's statements are viewed as accurate, this does not help the shipowner. According to Thai's version of events, Thai told Mac that the VIRA 8 had prepaid its insurance "until the end of April," and Mac indicated that the formal contract would provide for insurance if insurance was prohibitively expensive or unavailable "at the end of April." These statements, if made, might have created an obligation to provide insurance after April. However, they do not indicate any intention to provide insurance during April, the month in which the vessel was commandeered, and for this rea-

son the question of whether or not they were actually made is irrelevant.

10. This authorization was issued pursuant to 50 U.S.C. § 1431 (Supp. I 1987) and Exec. Order No. 10789, 3 C.F.R. 426 (1954–1958), *reprinted in* 50 U.S.C. § 1431 (Supp. I 1987), which authorize government departments and agencies which exercise functions in connection with the national defense to enter into contracts or modifications of existing contracts under certain conditions where such action would facilitate the national defense.

11. In this finding the district court adopted the language that counsel for the United States has employed throughout this litigation. The United States has never acknowledged that this memorandum established a program in the sense the word generally connotes.

an attached list of contractors "who may be indemnified."

The testimony of Captain William Chadwick as to the reasons for requesting authority to self-insure also supports the view that the memorandum merely provided authority and did not create an entitlement program of indemnification. In 1975 Captain Chadwick was the contracting officer for Military Sea Lift Command ("MSC") headquarters in Washington. It is undisputed that the evacuation from South Vietnam was a humanitarian effort specifically authorized by Congress for which Congress had appropriated only limited funds.

According to Chadwick, the Navy had entered into charter parties in connection with the evacuation prior to chartering the VIRA 8. These typically provided that the cost of war risk insurance premiums would be paid by the contractor with this cost passed through to the Navy. Beginning in the latter half of March of 1975 and continuing through April, war risk insurance became increasingly expensive as the situation in South Vietnam deteriorated. *See supra* note 8. Chadwick testified that in early April MSC officials came to view the war risk premiums as excessive for the risk involved. They formulated the opinion that shipowners should not purchase war risk insurance in those cases where insurance costs would be paid from the limited funds appropriated by Congress because the amount appropriated might be exceeded. On April 7 MSC proposed to the Secretary that MSC assume responsibility for war risk insurance by self-insuring.

Chadwick explicitly testified that MSC's primary concern in requesting authority to self-insure [12] was to avoid the very high insurance costs MSC was obligated to pay under existing charters for seven larger ships of much higher value.[13] Even with the addition of one other ship that Chadwick thought might have been included, the authorization applied to only eight ships. All of these ships had been chartered under contracts that obligated the Navy to pay for war risk insurance premiums.[14] It was necessary to cable the owners of these ships in order to exercise the authority the memorandum granted to MSC with regard to these vessels. The cable ordered the shipowners to not renew their insurance and to cancel existing policies if refunds could be obtained.[15] Chadwick's testimony on these matters is not disputed. His testimony on the issue of self-insurance when taken as a whole indicates that the Navy only intended to become a self-insurer in those cases where the Navy had a preexisting contractual obligation to pay for war risk premiums.

Because the Navy never agreed to provide war risk insurance for the VIRA 8 and because the text of the Secretary's memorandum and the witness testimony support the conclusion that the memorandum merely authorized self-insurance at the discretion of MSC in limited circumstances, the district court correctly found that the VIRA 8 was not covered by the Secretary's

12. As a secondary purpose, MSC desired to create future flexibility in case the evacuation continued for a significantly longer period than was in fact the case.

13. Chadwick estimated that these seven ships had an average value of eight million dollars. Before choosing to self-insure, MSC saw insurance bills reflecting premiums of up to three and a half percent of valuation, a sum of $280,000 for a vessel valued at eight million dollars. In comparison the VIRA 8 was originally insured at a value of $250,000.

14. Accordingly, the decision of the Navy to become a self-insurer of their vessels cannot be viewed as an intended benefit to shipowners, although the benefits to the Navy were significant. The shipowners who were affected by MSC's decisions regarding self-insurance were neither substantially benefitted nor harmed because they were already contractually entitled to have the Navy pay their insurance premiums. Aside from the incidental cost of financing war risk insurance, the only actual and intended beneficiary of MSC's authority to self-insure was the United States. War risk insurance was available throughout the period in question, although it was increasingly expensive. *See supra* note 8. If insurance had become unavailable during the relevant period, the Navy's decision to become a self-insurer of a vessel would be a significant benefit to its owner.

15. This was one of the conditions for the Navy becoming a self-insurer with regard to any given vessel.

memorandum and the United States was not obligated to grant the shipowner an indemnity that the Navy had not expressly agreed to assume.

The shipowner, in arguing that the memorandum created a program under which it was entitled to indemnification for the loss of the VIRA 8, has emphasized that the memorandum limited indemnification to vessels owned by shipping contractors who were on a a list attached to the memorandum. The VIRA 8 shipowner was the only contractor with ships chartered to the Navy in Vietnam that was not on the list. The district court found that the VIRA 8 shipowner was not included on the list of contractors eligible for indemnification because of the timing of the chartering of the vessel and the preparation of the memorandum.[16]

It is undisputed that the Secretary intended the list to include all of the contractors who were doing business with MSC in Vietnam and all of the contractors with whom MSC foresaw the possibility of doing business.[17] However, only eight ships chartered to MSC by four contractors who were on the list were affected by the authority MSC received to self-insure. All of the eight ships involved had been chartered under contracts that obligated the Navy to pay for war risk insurance premiums. Because MSC made use of the list in a discretionary manner, the district court was not clearly erroneous in finding that the memorandum merely authorized and did not require MSC to self-insure.

2. *Failure to indemnify the shipowner does not violate appellant's right to due process*

■ The shipowner also argues that the Navy's failure to indemnify it for the loss of the VIRA 8 violated its right to equal protection of the laws under the due process clause of the Fifth Amendment because it was arbitrarily excluded from a program that provided benefits to all owners who had chartered ships to MSC for use in Vietnamese waters. Even assuming that the VIRA 8's owners were intentionally excluded, there is no constitutional violation.

■ It was the Navy which had the option to self-insure and the authority to order its contractors to cancel war risk insurance and pay any refunds received to the Navy. The contractors had no election to make and no choice but to follow the instructions of the Navy. Since no suspect classification or fundamental interest is involved, the relevant inquiry with respect to a benefit program is whether MSC's election to self-insure some of the vessels it had under charter and its failure to indemnify the VIRA 8 shipowner is rationally related to a legitimate governmental interest. *Jimenez v. Weinberger*, 417 U.S. 628, 636–37, 94 S.Ct. 2496, 2501–02, 41 L.Ed.2d 363 (1974).[18]

It was rational and proper for MSC to self-insure only in those cases where it was already contractually obligated to reimburse the contractor for war risk insurance premiums under the terms of the charter. Those contractors who were affected by MSC's authority to self-insure had charters in which the Navy had agreed to pay for war risk premiums whereas the VIRA 8 shipowner did not.

Focusing on the omission of the VIRA 8 shipowner from the list, as the shipowner suggests, is inappropriate. If the officials who had drawn up the list had anticipated

**16.** The letter agreement was signed on April 9, and the Secretary signed the memorandum on April 10.

**17.** *See supra* note 12.

**18.** The government argues that the discretionary function doctrine shields from review the Navy's decision to not indemnify the shipowner under this program. This doctrine arises from 28 U.S.C. § 2680(a) (1965) which exempts from the government's general waiver of sovereign immunity under the Federal Tort Claims Act, 28

U.S.C. § 1346(b) (1976), those suits "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Because the doctrine stems from an exemption to a waiver of sovereign immunity for tort claims, the doctrine, when applicable, applies only to decisions alleged to be negligent, not those alleged to be violative of due process.

that the VIRA 8 shipowner might be interested in entering into future charters with the Navy during the course of the evacuation, the shipowner might have been included on the list. However, it is clear from the record that with respect to the VIRA 8, the Navy would not have become a self-insurer even if the shipowner had been on the list.

Chadwick testified that even if the timing of events had not caused the exclusion of the VIRA 8 from the list, the "VIRA 8, by ship or by owner, would have been excluded" because "[t]he request [from the MSC office in Yokohama, Japan] for the authority to enter into [the] contract indicated there would be no provision for the U.S. Government assuming war risk insurance...." For these reasons the omission of the shipowner from the list is irrelevant. No violation could have occurred because MSC had intentionally decided not to include war risk insurance in the charter, and it was this decision that precluded self-insurance in the instant case. No constitutional violation arises from the accidental accomplishment of what would have been the Navy's deliberate course of action.

### III. The Lost Profits Claim

On appeal appellant claims that it is entitled to lost profits at the daily hire rate for the period between April 30, the day the VIRA 8 was commandeered, and May 8, the day the North Vietnamese government took possession of the vessel. What appellant now terms "lost profits" is a portion of its broader claim for charter hire for the period between April 9 and May 8 that it alleged in its complaint as Count IV. Because the actions of the fleeing South Vietnamese soldiers frustrated the charter on April 30, the obligation to pay charter hire ceased on that date.

"Frustration of a charter party is a change of conditions so radical that accomplishment of the commercial object of the charter is made impossible." *United States v. M/V Marilena P.,* 433 F.2d 164, 167, note 1 (4th Cir.1969). When a charter is frustrated, the charter is canceled and the parties are released from their respective obligations. 2B BENEDICT ON ADMIRALTY § 9, at 1–75 (M. Cohen ed. 1986). American courts have found charters frustrated when the government of the ship owner has requisitioned the ship,[19] when war between the government of the shipowner and the destination country becomes imminent while the ship is enroute,[20] and when the ship has been destroyed.[21]

The commandeering of the vessel in the instant case was an event squarely within the range of events giving rise to the frustration doctrine. Just as appellant is not liable to the government for the value of the lost cargo, the government is not liable for charter hire after April 30. If we treat this issue strictly as a lost profits claim, appellant's claim is meritless. Appellant admitted that the VIRA 8 was scheduled for engine maintenance in Singapore after the conclusion of its charter with the Navy. The vessel's next charter was to begin on May 15, 1975. The vessel cannot maintain a claim for lost profits for any period between the date its charter with the Navy was frustrated and the date of its next charter because the vessel had no way of earning any profit until May 15.

### IV. Conclusion

With regard to the district court's denial of charter hire and interest for the five days from April 26 through April 30, the judgment is REVERSED. In all other respects, the judgment is AFFIRMED.

**19.** *Texas Co. v. Hogarth Shipping Co., Ltd.,* 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 423 (1921).

**20.** *North German Lloyd v. Guaranty Trust Co. (The Kronprinzessin Cecilie),* 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960 (1917).

**21.** *The Tornado,* 108 U.S. 342, 2 S.Ct. 746, 27 L.Ed. 747 (1883).