**Harold L. LAUDERDALE, Plaintiff,**

v.

**JOHNSTON INDUSTRIES, INC., Defendant.**

**No. CIV. A. 00–T–1308–E.**

United States District Court, M.D. Alabama, Eastern Division.

May 1, 2001.

William P. Traylor, III, D. Dirk Thomas, Yearout, Myers & Traylor, P.C., Birmingham, AL, for Plaintiff.

Tammy L. Dobbs, Constangy, Brooks & Smith, Birmingham, AL, for Defendant.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Harold L. Lauderdale filed this lawsuit charging defendant Johnston Industries, Inc. (JI) with terminating his employment and failing to rehire him because of his age, in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.A. §§ 621–634, frequently referred to as the ADEA. Lauderdale also asserts state-law claims for fraud and breach of contract as well as age-discrimination claims under the Alabama Age Discrimination in Employment Act of 1997, 1975 Ala.Code §§ 25–1–20 through 25–1–29. Jurisdiction over Lauderdale's ADEA claims is proper under 29 U.S.C.A. § 626. Jurisdiction over his state-law claims is proper under 28 U.S.C.A. § 1367 (supplemental jurisdiction).

This cause is now before the court on JI's motions for summary judgment. The motions will be granted as to Lauderdale's ADEA claims, and his state-law claims will be dismissed without prejudice.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993). In making a determination, the court must view all the evidence and any factual inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

Harold Lauderdale, who was born in 1948, began working for the company that is now JI in 1966. Except for brief absences for military service, education, and a one-year stint with another firm, he worked for the company continuously until November 1999, when his employment was terminated. Between 1976 and 1989, Lauderdale was promoted a number of times, and when he was discharged he was the plant manager of the firm's integrated mill, known as the Shawmut Complex. As plant manager, he reported to Bill Henry, President of the Finished Fabric Division, and he was responsible for the finishing department, product development, textile testing, plant engineering, human resources, and the inspection and shipping department.

In the fall of 1999, JI hired Distribution Consulting, Inc., an outside firm, to analyze the company's efficiency and costs. The Shawmut Complex was among the operations that Distribution Consulting evaluated. The report led Clark Ogle, JI's CEO, to conclude that Lauderdale was responsible for the Shawmut Complex's performance, which was unsatisfactory. Ogle decided to terminate Lauderdale's employment.

Henry recommended that Lauderdale's discharge be treated as a reorganization and job elimination rather than a performance-based discharge. This made Lauderdale eligible for severance pay. Howev-

er, JI did not inform Lauderdale that he was being terminated because of the quality of his work. Instead, Henry told him that the job action was unrelated to his job performance. Throughout his discharge proceedings, Lauderdale was led to believe that the reason for letting him go was because his job position was to be eliminated.

Consistent JI's representations, Lauderdale was offered a severance package amounting to more than $40,000, and he was asked to execute a release of claims against JI, including federal claims for discrimination based on age. After waiting a week, Lauderdale signed the release, giving up any "past and present right and claim of any kind." He has retained his severance benefits.

In November and December of 1999, after his discharge, Lauderdale contacted company employees about being rehired. He phoned Harold Harvey, President of JI Fabrics Division, at his office in New York. Harvey suggested that they meet a few weeks later in Alabama. However, Lauderdale did not meet with Harvey, and did not speak to him again. Lauderdale attempted to call Harvey in the first week of March 2000, but did not reach him. Additionally, Lauderdale was also informed by other JI employees, Knox Ferris, Donnie Lauderdale, and Bob Eubanks, that there was a good chance that he would be able to come back to JI.

In January 2000, a report by another consultant, T.W.G. Ashdown, indicated that JI's management structure at the Shawmut Complex was working badly. On May 15, 2000, after the report, Charles Eichelberger, Jr., the 30 year old son of the eponymous Vice President of Manufacturing at JI Fabrics, was promoted from among a group of internal candidates to a position as operations manager. Eichelberger was considerably less experienced and qualified than Lauderdale had been. Eichelberger was initially responsible only for "finishing" but later became responsible for testing.

After learning of Eichelberger's promotion, Lauderdale filed a charge of age discrimination with the Equal Employment Opportunity Commission. The Commission dismissed the charge as untimely because it was filed more than 180 days after Lauderdale was terminated. Consequently Lauderdale filed a second complaint with the Commission charging discriminatory failure to reinstate because of his age.

## III. ADEA CLAIMS

Lauderdale has stated two ADEA claims: that JI discharged him because of his age in the fall of 1999; and that the company refused to rehire him because of his age in 2000.

### A. Discharge Claim

JI contends that Lauderdale cannot pursue his ADEA discharge claim because he released it. Lauderdale responds that, for two reasons, the release he signed does not bar his claim: first, the release was executed before his discharge claim arose; and, second, he was fraudulently induced to sign the release.

i.

The terms of the release are unambiguous: Lauderdale agreed to "give up every past and present right or claim of any kind ... related to [his] employment ... and ... the termination of [his] employment ... includ[ing] ... those which could arise under ... the Age Discrimination in Employment Act of 1967."[1] The release further provides that Lauderdale agrees "not to file a lawsuit or initiate any

---

1. The release that Lauderdale executed provides, in pertinent part, as follows:

"Election and Release

. . . . .

In exchange for severance pay, I (and anyone acting on my behalf) agree to give up

proceeding related to such rights and claims." Thus, under the release, JI is protected not only from the assertion of any ADEA rights and claims by Lauderdale, but also from even being haled into court to defend against ADEA suits. The release, however, also explicitly states that it does not cover "rights and claims that may arise after [the] ... release form becomes enforceable." The first question before the court, therefore, is whether Lauderdale's ADEA discharge claim arose before the release was executed. It had.

Lauderdale's contention essentially is that the discrimination against him did not occur until JI replaced him with Eichelberger in May 2000, which was, of course, after he signed the release and it became enforceable on November 25, 1999. This argument is meritless because it confuses the ADEA claim itself with the evidence that a plaintiff may choose to present as proof of that claim. The discriminatory act of which Lauderdale complains is his *discharge* on November 8, 1999, an act that was completed before his release was executed and became enforceable.

The law is well-established that a plaintiff may prove that a discharge was discriminatory in two ways: with either direct or circumstantial evidence. Direct evidence is "evidence, which if believed, proves the existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987) (emphasis omitted); *see also Bonham v. Regions Mortgage Inc.*, 129 F.Supp.2d 1315, 1322 (M.D.Ala.2001) (Thompson, J.) (direct evidence is "evidence [that] reflect[s], without inference or presumption, a specific discriminatory intent to commit the challenged conduct.").

To prove an ADEA claim by circumstantial evidence, "[t]he plaintiff must first establish a prima facie case of discrimination. One method a plaintiff can use to establish a prima facie case for an ADEA violation is by showing that he (1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Another method of establishing a prima facie case would be to show the first three factors and (4) that a similarly situated younger individual was not

every past and present right or claim of any kind, whether legal, equitable, or otherwise, that is related to my employment with the Employer and the Employer's termination of my employment. I give up such rights and claims against the Employer and any entity or person related to the Employer ..., and I agree not to file a lawsuit or initiate any proceeding related to such rights and claims against any of them.

These rights and claims include, but are not limited to, those which could arise under ... the Age Discrimination in Employment Act of 1967, as amended ... or any other federal, state, or local law, statute, or regulation.

. . . . .

Finally, I state:
1) That I have been told that I have up to twenty-one (21) days to review and consider ... this Election and Release form and that

I have been told to discuss them with my attorney;
2) That I have been told that I have seven (7) days following my signing of this Election and Release form to revoke or cancel it;
3) That I have been told that this Release does not apply to any of my rights or claims that may arise after this election and release form becomes enforceable;

. . . . .

7) That I understand all of the terms of this Election and Release form and the effect of my Release; and
8) That I sign this form as my own free act and deed and that I hereby release my rights and claims as set forth above in exchange for the severance pay referred to above, which is not something to which I am already entitled."

subjected to the same adverse employment action. *See Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir.2001).

If a prima facie case of discrimination is established, "the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action.... If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman,* 229 F.3d at 1024 (quotation omitted).

Lauderdale has simply sought to prove his ADEA discharge claim circumstantially with evidence of his replacement by a younger person. The fact that JI replaced Lauderdale in the spring of 2000 with an individual who was substantially younger is merely circumstantial evidence of JI's discriminatory intent back in November 1999—that is, that the company discharged him back then because of his age; later replacement is not a part of Lauderdale's claim. Lauderdale could just as well have proven his discharge claim by direct evidence from a decision-making supervisor stating that he was being discharged because he was too old, or by circumstantial evidence that a similarly-situated but substantially younger colleague was not terminated; in both instances, Lauderdale could make out his case without any evidence of replacement at all. Or to put it another way, JI did not have to replace Lauderdale before his claim could be considered as having arisen. Thus, Lauderdale's discharge claim existed, that is, arose, when he was discharged on November 8, 1999, which was before he executed the release.

ii.

■ Lauderdale contends next that the release is invalid because JI fraudulently induced him to release his ADEA rights. Releases of ADEA rights are governed by the Older Worker Benefit Protection Act, 29 U.S.C.A. § 626(f), frequently referred to as the OWBPA.[2] *See Oubre v. Entergy*

2. 29 U.S.C.A. § 626(f) provides:

"Waiver

(1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum—

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in

*Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998); *Griffin v. Kraft General Foods, Inc.,* 62 F.3d 368, 373 (11th Cir.1995). In the statute, Congress expressly approved the practice of releasing and waiving ADEA rights and claims, but subject to certain restrictions. The OWBPA mandates that any release or waiver be "knowing and voluntary," 29 U.S.C.A. § 626(f), and specifies eight requirements that, if fulfilled, are minimum indicia that a release or waiver was knowing and voluntary. *See* 29 U.S.C.A. § 626(f)(1).

The parties do not contest that the release executed by Lauderdale complied with the minimum requirements mandated by the OWBPA, and Lauderdale has not argued that he did not understand the release or that he lacked the capacity to agree to it. Instead, Lauderdale contends that the release is invalid because JI affirmatively misrepresented its reasons for discharging him, that is, the company misrepresented that he was discharged for a reason other than his age. Because the OWBPA sets forth minimum requirements for a knowing and voluntary release or waiver and thus does not set forth all requirements, the fact that a release or waiver complies with the eight requirements does not necessarily mean that the release or waiver is knowing and voluntary under the ADEA and that persons challenging the release or waiver are without recourse. Therefore, despite the fact that Lauderdale's release complied with the ADEA's eight requirements, the court must still address the interesting question of whether Lauderdale's allegation that JI misrepresented that he was fired for a non-discriminatory reason could, even if true, vitiate the release.

The court sums up Lauderdale's contention regarding JI's arguably fraudulent conduct as follows: He was assured that the reason for terminating his employment was that JI intended to eliminate his job. Based on this representation, he agreed to waive any claims arising out of his termination, including ADEA claims. Now, in light of the promotion of Charles Eichelberger, Jr., Lauderdale feels that he has a valid ADEA claim: He is old enough to be in the class of persons protected under the ADEA, he was replaced, his replacement is substantially younger, and he was qualified for his job. Moreover, Lauderdale contends JI has been caught in a lie that shows that the reason it gave to him for his discharge was false: Although Lauderdale was told that his discharge was not performance related, now the company claims that unsatisfactory performance was indeed the reason for ending his employment.

The facts, as construed in favor of Lauderdale, add up essentially to nothing more than a restatement of Lauderdale's claim for age discrimination. That is, Lauderdale attempts to raise an inference of discrimination by making out a prima facie

subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to—

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

(2) A waiver in settlement of a charge filed with the Equal Employment Opportunity Commission, or an action filed in court by the individual or the individual's representative, alleging age discrimination of a kind prohibited under section 623 or 633a of this title may not be considered knowing and voluntary unless at a minimum—

(A) subparagraphs (A) through (E) of paragraph (1) have been met; and

(B) the individual is given a reasonable period of time within which to consider the settlement agreement."

case, and then attempts to rebut the legitimate, non-discriminatory reason that JI has proffered for discharging him. Lauderdale alleges that JI therefore fraudulently misrepresented to him that its reason for terminating his employment was not his age, and that, in signing the release, he relied on that misrepresentation to his detriment. In short, according to him, had he known he was being terminated illegally, he would not have released his ADEA rights and claims. The court holds that such allegations of fraud—which, as stated, are essentially nothing more than a restatement of the underlying discrimination claim—are, as a matter of law, insufficient to render an otherwise valid release void or voidable.

■ That truthful knowledge of the reason behind an employer's adverse employment action is not required for a valid ADEA release is clear from the consequences of holding otherwise. To hold that a release is valid only if the plaintiff has truthful knowledge of the reason for an adverse employment decision would be to render releases and waivers effective and valid only where the employer admits (untruthfully as well as truthfully) liability for age discrimination. In all other circumstances where the employer explicitly or implicitly denies liability, the employer could end up litigating the underlying ADEA claim despite a release or waiver.[3] Releases, such as the one at issue here, protect employers not only from claim liability but even from being haled into court on such claims. If the validity of a release or waiver turned on whether the employer had told the truth about the reason for its adverse employment decision, an employee could always litigate a released discrimination claim, even one that is meritless, simply by claiming that the reason given by

the employer for its employment decision was not true and that the true discriminatory reason was fraudulently hidden from him. Thus, not only in cases where the employer had hidden a discriminatory reason but also where it had given a truthful nondiscriminatory reason for an adverse employment action, an employer could be haled into court although the release provided, as the one here did, that the employer is be protected from ADEA suits themselves.

There is nothing in the ADEA or the OWBPA that suggests that Congress intended to force employers to admit (truthfully or untruthfully) to liability before a release could be valid. *See Sheridan v. McGraw–Hill Companies, Inc.,* 129 F.Supp.2d 633, 639 (S.D.N.Y.2001) ("An examination of plaintiff's argument reveals that the rule that he would have this Court apply would in essence require an employer to confess to unlawful discrimination before a valid waiver of ADEA claims could be executed. Otherwise, without such a confession, *any* waiver would be based on misleading information and thereby fraudulently induced. Such a reading is both illogical and unsupported by the statutory policy."). Accordingly, Lauderdale's release was knowing and voluntary and thus valid under the ADEA even if, in fact, his discharge was because of his age.

A close reading of the OWBPA's text is consistent with this conclusion. The eight minimum requirements for a knowing and voluntary waiver and release counsel that Congress was not concerned to safeguard knowledge of actual claims, but to protect an older employee's ability to decide to forgo the possibility of a claim with legal advice and without undue pressure. Noth-

---

**3.** Even an employer's silence could leave the employer open to the contention that it had

fraudulently suppressed relevant facts.

ing in these requirements suggests that Congress sought to require that, before release, individuals must be aware of valid claims or even that employers are under any obligation to reveal facts indicating the existence of such claims.

To be sure, Congress specifically mandated additional disclosures in cases where releases are requested in connection with an "exit incentive or other employment termination program offered to a group or class of employees." 29 U.S.C.A. § 626(f)(1)(H). In such cases, often associated with group layoffs or incentive programs aimed at senior employees, an employer must additionally inform each member of the group of the eligibility requirements for the program and the ages of eligible employees. It must also inform the group of the ages of employees in the same job classification or unit who are not eligible. *See* 29 U.S.C.A. § 626(f)(1)(H)(i), (ii). That is, an employer must affirmatively offer information that could put the group's members on notice of possible age discrimination. But even in the context of exit incentives and employment termination programs, the employer need not inform the employees of actual discriminatory intent before there can be a valid release. The employer need only inform the employees of circumstances that might put them on notice of the need for further investigation.

■ This conclusion, that the validity of a release or waiver cannot turn on whether the stated reason for the adverse employment decision is true, agrees with the principles of the law of releases more generally. It is well settled that releases of unknown claims are valid and enforceable. *See, e.g., Morta v. Korea Ins. Corp.,* 840 F.2d 1452, 1458–59 (9th Cir.1988) (construing Guam law to hold enforceable an express and intentional release of unknown claims); *La Fleur v. C.C. Pierce Co., Inc.,* 398 Mass. 254, 496 N.E.2d 827, 831 (1986)

(holding that intention of the parties is controlling as to whether a claim for an unknown injury may be waived); *Mangini v. McClurg,* 24 N.Y.2d 556, 301 N.Y.S.2d 508, 516, 249 N.E.2d 386 (1969) (permitting releases of known and unknown injuries under New York law); *Aronovitch v. Levy,* 238 Minn. 237, 56 N.W.2d 570, 576 (1953) (if the parties did in fact intentionally agree upon a settlement for unknown injuries, such release will be binding); 66 Am Jur 2d, Release § 32 (parties may preclude recovery for all injuries, whether known or unknown, if that is their intention).

Nor is this holding in tension with the rule of the Eleventh Circuit Court of Appeals in *Griffin v. Kraft General Foods, Inc.,* 62 F.3d 368 (11th Cir.1995). There, the appellate court held that, before a court may dismiss a claim based on a release that satisfies the minimum statutory requirements of the OWBPA, it must consider any nonstatutory factors that may render the waiver not knowing or voluntary. *See* 62 F.3d at 374. This court has accordingly looked to the nonstatutory factor of fraud that Lauderdale has raised. The court has, however, concluded that Lauderdale's nonstatutory contention lacks merit.

Neither does this holding mean that an ADEA release can never be vitiated by fraud. The court's holding is narrow. There are other scenarios involving fraud that could render a release unenforceable under the ADEA and the OWBPA. If, for example, in order to induce an employee to release his ADEA claim in exchange for present consideration, an employer misrepresents that it will enter bankruptcy and will be unable to satisfy any possible judgments in the future, such a release could be unenforceable. In such an instance, unlike here, the misrepresentation would not go to the very claim or right that is being released.

## B. Failure–to–Rehire Claim

■ Lauderdale has stated a claim for discriminatory failure to rehire. He alleges that he sought reemployment with JI after his discharge and that JI failed to rehire him because of his age. Lauderdale's claim fails, however, because he has not raised an inference of discrimination regarding his efforts to be hired to any new positions at JI, and insofar as he sought to be rehired to his old position, his claim in barred.

The court first examines the merits of Lauderdale's claim. The court has already summarized the principles that govern the order and allocation of proof for ADEA cases. Lauderdale does not claim that he has direct evidence of discrimination. Therefore, the court analyzes his claim under the well-established framework for circumstantial evidence. The overarching question in determining whether a plaintiff has established a prima face case is whether "an ordinary person could reasonably infer discrimination from the facts shown." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir.1988). Summary judgment is appropriate if a plaintiff fails to establish his or her prima facie case. *See Turlington*, 135 F.3d at 1433.

Lauderdale's prima facie case for failure to rehire is fatally flawed because he has not specified what position or positions he sought with JI. There is no dispute that Lauderdale, age 51, is in the protected class of persons under the ADEA, that he was qualified for employment with JI, and that a failure to rehire, if proven, would be an adverse employment action. Lauderdale claims that his contacts with other JI personnel amounted to job applications, and that his failure to be hired back to JI was age discrimination. The evidence shows that he contacted Harold Harvey, President of the JI Fabrics Division, about returning to the company in November and December of 1999. Harvey admits that Lauderdale expressed interest in returning to JI after he had been terminated. Lauderdale has also presented evidence to show that he placed two phone calls in March 2000 to Harvey in New York, but he does not claim that he spoke to Harvey at that time. There is some indication that Lauderdale spoke to other employees, specifically Knox Ferris, Donnie Lauderdale, and Bob Eubanks, about coming back to work at JI, but there is no evidence that these other employees were authorized to make hiring decisions.

Thus, there is no evidence that Lauderdale applied for any *particular* new positions at JI. Indeed, he has not even specified any positions that he believes he should have been hired to, with the possible exception of the job of operations manager to which Eichelberger was promoted. As the court explains below, Lauderdale may not maintain a claim for this position. Thus, even construing the facts favorably to Lauderdale, no reasonable jury could find discrimination based on them, because it is impossible to infer that any substantially younger person was hired to a position he sought other than operations manager. Such evidence is usually at the heart of circumstantial cases of discrimination in hiring. And without some specificity about which positions Lauderdale sought and how they were filled, no inference of discrimination can be drawn.

■ Next the court examines the possibility that Lauderdale sought the operations manager position. Both Lauderdale and JI have submitted conflicting evidence as to whether this position was a new position, or whether it was nothing more than Lauderdale's old position with a new appellation—that is, old wine in a new bottle. Regardless of whether Lauderdale or JI is correct, however, Lauderdale may not maintain an age discrimination claim in connection with it.

If the position was a new one, there is no evidence that Lauderdale applied for it. The record is barren of evidence that he knew the position existed in November or December of 1999, when he was actively seeking to be rehired to JI. Nor is there any evidence that the position actually existed at that time. The evidence indicates that the position was created, at the earliest, after January 2000 when the consultant's report came out suggesting that the new management structure at the Shawmut Complex was not working. Moreover, Lauderdale has presented nothing to suggest that his efforts created any obligation on JI's part to consider him on an ongoing basis, that is, to consider him for positions that did not exist in November or December of 1999 when he made known his desire to be rehired. Absent any evidence that Lauderdale actually sought the operations manager position, was considered for it, and was rejected for it, no reasonable jury could find that Lauderdale suffered discrimination because he was not hired to it.

If the position were nothing more than Lauderdale's old position, his claim is still meritless. The Eleventh Circuit Court of Appeals has cautioned that a request for reinstatement after an alleged discriminatory discharge does not give rise to a separate claim for discrimination unless it constitutes a "new and discrete act of discrimination in the refusal to rehire itself." *See Hargett v. Valley Federal Sav. Bank,* 60 F.3d 754, 763 n. 10 (1995). A "simple

request for reinstatement seeks to redress the original termination." *Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir.1985) (quotation marks omitted). The court finds that insofar as Lauderdale may have applied for the operations manager position and that position was his old one, his actions amounted to nothing more than a request for reinstatement. His claim for failure to rehire, therefore, does not involve any "new and discrete act of discrimination" separate from his discharge, which, as shown above, was released. Therefore, he may not maintain this claim for failure to rehire. *See, e.g., Hargett,* 60 F.3d at 763 n. 10. Summary judgment will be entered in favor of JI on this claim.

## IV. STATE–LAW CLAIMS

Because summary judgment is due to be entered on Lauderdale's federal claims, the court declines to exercise supplemental jurisdiction over his state-law claims for age discrimination, fraud, and breach of contract, and thus these claims will be dismissed, albeit without prejudice to the pursuit of these claims in state court.[4] *See* 28 U.S.C.A. § 1367(c)(3); *L.S.T., Inc. v. Crow,* 49 F.3d 679, 685 (11th Cir.1995) (per curiam).[5]

## V. CONCLUSION

Because Lauderdale's claim for discriminatory discharge was waived and his claim for failure to rehire is fatally flawed for the

---

**4.** The court's conclusion that Lauderdale released his discharge claim may or may not apply to his state-law age discrimination claim.

**5.** The dismissal without prejudice of the state-law claims should not work to Lauderdale's disadvantage. Section 1367(d) provides for at least a 30–day tolling of any applicable statute of limitations so as to allow a plaintiff to refile his claims in state court. The section states:

"(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

reasons discussed above, summary judgment will be entered in favor of JI on those claims. As stated, Lauderdale's remaining state-law claims will be dismissed without prejudice.

An appropriate judgment will be entered.